## DANIEL DENNY & *al. versus* NATHANIEL GILMAN & *al.*

Where a bill in equity alleges, that the plaintiffs were induced to relinquish a portion of their original just and legal demand, against the defendants, upon payment and security of the balance, by reason of false and fraudulent representations by the latter of the amount and condition of their property; but does not ask, that the contract of settlement should be rescinded, nor that the contract as originally existing, should be restored, nor asks for discovery, but seeks only to recover compensation in money for the injury sustained by the fraudulent representations of the defendants; this Court as a court of equity, cannot entertain jurisdiction, there being a perfect remedy at law.

The statute of limitations applies to suits in equity as well as at law.

Fraud cannot be imputed, where no design to deceive, is manifest.

But although the statement of what another said, in relation to property liable to the payment of the debt, was literally true; yet if the persons making such statement knew that it was false, and made it with the intention to deceive, and to induce those to whom it was made to give up a portion of their claim, and the statement did deceive, and the party was defrauded thereby; the literal truth of the statement of what was said furnishes no excuse.

THIS was a bill in equity brought by Denny & Dutton, merchants of Boston, against Gilman, Williams & Dow, formerly merchants in the city of New York.

The facts appear in the opinion of the Court.

*Weston* and *H. A. Smith* argued for the plaintiffs, —

*Evans,* for Williams & Dow, — and

*F. Allen,* for Gilman.

Denny v. Gilman.

As the arguments of the counsel required nearly fourteen hours for their delivery, it is obvious, that the limits permitted to any single case preclude the publication of any sketch which would do them justice.

The opinion of the Court was drawn up by

TENNEY J. — The plaintiffs allege in the bill, that Williams & Dow, as a firm, being their debtors for merchandize delivered in January, 1837, in the sum of $8438,84, represented to them on June 27, following, that they had failed, exhibiting what they called a statement of their concerns and declaring that they did not think they should be able to pay more than fifty per cent. of their debts, if so much; and on the 29th day of the same June, the said Williams & Dow, as a firm, further represented to them, that Gilman, the other defendant, declared that he had more debts of his own, than he could possibly pay. And the plaintiffs aver, that confiding in the truth of these statements and others of a like character, which were made to them, from time to time, by said firm, they did, on Sept. 13, 1837, accept of the firm a composition of the said debt in cash and notes, to the amount of $5625,89, which subjected them to the loss of the balance. And the plaintiffs aver further, that on June 9, 1837, the defendants were indebted to them in another sum of $2307,15, for money advanced by them, for the use of the firm of Williams & Dow, together with an interest account against said firm, amounting on April 12, 1838, to the sum of $2670.02; that on the day last named, confiding in the truth of the statements made as before mentioned, they accepted in money and notes, as a composition of the debt last referred to, the sum of $2124,54, whereby they sustained a loss of the balance.

And the plaintiffs aver, that said statements were false and fraudulent, and had the effect to deceive them; that the defendants had, at the times of the compositions, either as a firm or as individuals, ample means, wherewith to have paid the whole amount of their debts to the plaintiffs, each of the defendants being by law, liable for the same. And the plaintiffs

aver, that Gilman alone had then, and now retains, property far beyond, that wanted to pay in full the sums justly due to the plaintiffs; that being deceived, they did not for more than two years, discover the real truth of the case; that Gilman was well aware that the plaintiffs were deceived, and accepted and availed himself, with the other members of the firm, of the compositions. The plaintiffs ask a decree, that the defendants pay the amount of the losses aforesaid, and that they answer upon oath to the matters and things alleged in the bill.

The defendants severally answer under oath. They admit their former indebtedness and the composition of the same, but deny that any composition was made after September, 1837.

The representations alleged to have been made by the firm of Williams & Dow, on June 27th and 29th, 1837, are admitted; they were in letters, under their respective dates, and are made a part of their answers; they allege, that the statements therein were true, and that the statement referred to, in the former of the letters, contained a just and true exhibit of the concerns of the firm, so far as the then unsettled state of their affairs, would enable them to make it. The letter of Gilman under date of September 5, 1837, makes also a part of their several answers; the writer therein states, that it set forth the condition of his business affairs; Dow states, that the same was exhibited to the plaintiffs or one of them, and read before the compositions referred to, in the plaintiff's bill, were finally agreed upon. The defendants each answer, that according to their best knowledge, information and belief, the compositions were obtained fairly and honestly, on a fair and just exposition of the concerns of the company, without any artifice, imposition or concealment, or fraud, of any kind, made or intended, by either of the defendants, and they deny that the representations made, had any effect to deceive or defraud the plaintiffs.

Williams & Dow state, that so far as they could judge of their concerns, as they were correctly stated in their exhibits sent to the plaintiffs, their effects would not avail them more than to pay fifty per cent. in cash, if so much, of the debts

due from them. Gilman states, that from the exhibit, it could not be judged, that the company would pay more than fifty per cent. with costs. Gilman further states, that about the time of the failure of the firm of Williams & Dow, being applied to by them for further assistance, in their pressures, replied to them that he had more to do, to keep the firm of Thomas Small & Co. from failing, than seemed possible; but he denies, that either he or any person for him, with his knowledge or consent, made the representation to the plaintiffs, that he owed more debts of his own, than he could possibly pay. That at the time of the failure of Williams & Dow, before and after, he was concerned with the firm of Small & Co. and between $40 and $50,000 of his own cash capital, was invested therein; that they had become greatly embarrassed, most of their debts being unavailable by the failure of their debtors; they had at the time, as he remembers and believes, more than $50,000 of failed paper; their stock was large, and could not be wholly sold or in part, without great losses. The members of the firm of Thomas Small & Co., consisting of Thomas Small and William Miles, possessed little or no property, had lost by speculations, and without his consent, had drawn from the funds of the firm, more than $10,000; that firm was pressed and hired money at a rate of interest varying from one to three per cent. a month for short periods; he was greatly pressed to keep this firm up, and the endeavor often seemed hopeless. That about the time of the failure of Williams & Dow, he met with heavy losses in navigation, and from bad debts, other than those due to the two firms before mentioned, which losses and those he sustained, in the firm of Thomas Small & Co., amounted, as he believes, to more than $100,000. With these losses, and the large expenses incurred in living in New York, business being prostrated, banks having failed, and confidence gone, and owing more than $100,000 besides the sums due from the firm of Williams & Dow, the prospect of getting out of debt, was extremely small. The large debts due to him were of little avail in raising cash. Vessels and other property, and real estate in

Maine which he owned, would sell only at ruinous losses; and in June, 1837, and afterwards, he feared for a large portion of the time, that it would not be possible for him to pay his own debts, apart from what was due from the firm of Williams & Dow. His entire failure was avoided by obtaining postponements of pay days; and several thousands of dollars of his indebtedness in 1837 remain unpaid.

The defendants in their several answers, submit to the Court, that in the matters in the bill mentioned and complained of, the plaintiffs have a plain and adequate remedy at law, and are not entitled to relief from a court of equity, and ask the same benefit from this defence, to which they would have been entitled, if they had demurred to the bill.

The bill does not ask, that the contract of settlement under the composition should be rescinded, and the contract as originally existing should be restored with the rights secured thereby; neither does it purport to be for discovery and relief; or present a claim upon the ground, that the notes first given were obtained by the fraudulent acts and representations of the defendants, and that therefore, they are entitled to relief as upon securities, which have been lost or destroyed. But they seek to recover damages alone, for the injury accruing to them by the fraudulent concealment and misrepresentation of the defendants, which resulted in the delivering up of the notes. A compensation in money alone, is sought. It is not manifest, that the plaintiffs have not a plain and adequate remedy at law for all the injury which the bill alleges, they have sustained, and for which they ask redress. Such a remedy must be wanting to entitle this Court, sitting as a Court of Chancery, to entertain jurisdiction. Something more must be sought in a bill in equity, than a simple application for a decree in damages, which may be awarded by a jury in a suit at law. *Woodman* v. *Freeman*, 25 Maine R. 531.

But the facts alleged in the bill and relied upon in the proofs, if established, as the plaintiffs contend that they have been, might perhaps have authorized an application in a bill, which would have so presented the case, as to have brought it within

the equity jurisdiction of this Court. It was probably their intention, to ask for all the remedy which a court of equity could afford, and pray for such decree and relief as the facts, supposed by them to exist, would justify and require. It may not be improper, therefore, to consider the grounds, upon which the bill is attempted to be sustained on the one hand, and defended upon the other.

The defendants insist that the claim of the plaintiffs has become stale, and that the relief sought should for that cause be denied.

The application of the statute of limitations is not confined to suits at law, and it is admitted by the counsel for the plaintiffs, that it equally affects those in chancery. But it is insisted that this defence cannot avail ; 1st, because the bill alleges, that the fraud of the defendants was not discovered, until two years after it was successfully perpetrated, which it is contended is not denied in the answers ; and 2d, that the final settlement under the composition was not completed till a time, which was less than six years preceding the filing of the bill.

If the defendants had denied in terms, that the plaintiffs were not ignorant of the fraud, by which they were subjected to the losses alleged in the bill, for two years after it was committed, it would imply an admission, that they were guilty of the fraud complained of, which they expressly negative throughout their answers. When they deny all fraud and at all times, and all concealment, the admission, that the plaintiffs were ignorant thereof for two years, cannot be inferred, but is repelled. But the plaintiffs rely upon facts, which they contend are established, and which they insist show the fraud alleged. If they would rely upon their own ignorance of those facts, for the space of two years after their existence, such ignorance is not supposed to be within the knowledge of the defendants, if they were guilty of no concealment, but must be shown by proof ; we have seen no such proof, excepting the allegation in the bill, which is not evidence upon this point for the plaintiffs.

The answers of the defendants deny that any compositions

alleged in the bill, were made subsequent to September, 1837 ; these are responsive to the bill, upon this point, and are to be regarded as true, till overthrown by sufficient competent proof. Such proof, it is contended, is found in the two depositions of Lloyd, and the plaintiffs' books. The latter are not in evidence, and it is contended by the defendants, that they would be inadmissible, if they had been filed among the exhibits. Instead of the books, is a copy of a transcript therefrom, verified by the oath of Lloyd. In his first deposition, Lloyd testifies that there was a settlement subsequent to that of September 13, 1837, made between the plaintiffs, and the firm of Williams & Dow, on April 12, 1838, "as I find from the date of the entry in my handwriting." He says afterwards, "I think, the terms of compromise as to the plaintiffs' whole claim, were made at the time of the first settlement, which I find by the books, was Sept. 13, 1837." In the second deposition he says, "the last five lines in the document [paper marked A, annexed to his deposition] under date "1838," I *presume*, were not made in the book, at the same time, that I entered those under previous dates. I *do not know*, but I presume, they were made under the respective dates. Part of the memoranda in the document, A, has, I *presume*, been made since the settlement." The witness is understood not to testify from his own knowledge or remembrance of the facts in reference to dates upon the book, or upon the document A, and there is no evidence that the dates upon either are correct. But if the depositions showed, that the dates upon the document indicated truly, when the business was done, in the absence of the book, even if it were admissible in evidence, we have the depositions of one witness only and nothing more, which cannot control the express denial in the answers, that the compositions were made subsequent to September, 1837.

Were the representations made by the firm of Williams & Dow, on the 27th and 29th of June, 1837, false and fraudulent, and did they have the effect to deceive and defraud the plaintiffs? The exhibit of the liabilities and the assets of the firm, are alleged in the answers to be as matters of fact, true

and just, and it is not attempted to be proved otherwise. There is no evidence in the case, that the failure in April, 1837, was voluntary, but it is manifest, that it arose from necessity, after Gilman withheld farther aid. The statement in the letter of June 27, 1837, that they could not judge, that the firm would be able to pay over fifty per cent. of their debts in cash, purports, to be an opinion, which subsequent events have shown to be somewhat erroneous. The evidence exhibits the receipt of more money from the assets. But the sequel could not be foreseen, at the time the statement was made, and if the belief there expressed was honestly entertained, upon the grounds which were fully made known to the plaintiffs, or so far indicated, that they could with common care and prudence possess themselves thereof, the representations, though since proved to have been magnified, cannot be regarded as a fraud. Fraud cannot be imputed, when no design to deceive is manifest. In the representation which Williams & Dow made of the great deterioration in the value of their assets, they professed to give the facts on which the opinions expressed were based. If these facts were not really as represented, the falsehood could have been ascertained. The means of a more rational opinion were presented, or within their reach, if those given, were erroneous, more than two months having elapsed between the representation complained of, and the composition. It was a time, when the firm might well anticipate greater disasters, than any which had yet overtaken them. The answers and proof show such a derangement of commercial undertakings, arising from a general want of confidence, the prostration by failure of houses before deemed strong, the withdrawal from active business of much of the capital, on which those engaged, had hitherto thought it safe to rely, and the high rates of interest; and the difficulty and expense attending exchanges, between New York and the more distant States, in which many of the debtors of the firm, resided, and the causes, which produced all this revulsion from a state of prosperity, then in full operation, prognosticated to the fears at least of the firm, a breaking up of the deep foundations, on which their hopes of success had been placed. It

is not strange, that the general consternation, which prevailed among merchants and traders, should have reached the defendants as well as others, who had sunk under pressures, less weighty, than those which they might suppose would fall upon them. And if there had not been a change for the better, even worse results than those expressed by the defendants might have been apprehended.

The plaintiffs, however, rely upon the testimony of Daniel Dwight and Francis Hobbs, who had been clerks of Williams & Dow, to show that they early entertained the design to secure to themselves a benefit at the expense of their creditors. The former deposes, that about the time of the failure, Dow said, it was occasioned by the fault of Gilman, as he was able to carry them through, but would not advance. He then requested the deponent to make the thing look as bad as possible, to any of the creditors, who might come in, and to tell them, they had better take what was offered, which was understood to be goods on hand at their cost, and this the deponent did. Dow was very much excited about the failure. The other deponent testifies, that about the day the first note was protested, Dow said it was a shame, that they should fail. Gilman said he could not keep up both firms, he must let one go down. A day or two after the failure, there was an altercation between Gilman and Dow because the former would not furnish money to keep the concern up, when Dow was excited, showed temper, and threatened Gilman with personal violence. Soon after, on being informed, that Gilman had supposed it would become necessary that a receiver should be appointed and take charge of the goods, Dow replied, that he was calmer, and could do better with the concern than any other, that he had put into the firm $9000, and he intended to get it out again. If the designs thus expressed, were deliberately formed under the same knowledge of facts, which Dow possessed, when the representations to the plaintiffs were made on the 27th and 29th of June following, and continued to be entertained till those times, it is certainly indicative of a determination to make an arrangement with their creditors less

favorable to the latter, than they would have a right to claim. But this was said under the excitement, produced by the failure, not premeditated, and which he believed at the time, it was in the power of Gilman to prevent, by affording the aid required. It does not appear that a composition was then thought of. Dow was desirous that the goods should be returned to those who sold them, or other creditors at cost. He had not then had the opportunity to see the true condition of their affairs as he had afterwards; his excitement against Gilman, for the reasons given by the deponent Hobbs, can be accounted for only on the ground that in Dow's opinion they would have been kept up, to their advantage, by timely assistance; and he might then honestly suppose that under his management, enough might eventually be realized to discharge their liabilities, and save his capital. But even if he did at that time cherish the dishonest purpose imputed to him, it does not follow that every thing, which he did, to bring about an arrangement with his creditors, by a composition of these debts afterwards was of the same character. The answers of the defendants are full in the denial of any fraudulent intention, in the representations made months afterwards, under a more perfect knowledge of their true condition, and when they were uninfluenced by excited feelings.

The letter of Williams & Dow of the 29th of June, 1837, represents, that Gilman said he had more debts of his own, than he could possibly pay. The truth of this, is substantially shown by the answers of Williams & Dow. Gilman, in his answer, denies that he authorized such a representation to be made to the plaintiffs. This denial is not inconsistent with the answers of the other defendants; and if it were so it is not evidence against the answers of the latter. But notwithstanding Williams & Dow in this matter represented to the plaintiffs no more than the language of Gilman would justify, still, if they knew, and Gilman knew, that it was false, and the statement was made to deceive, and to induce the plaintiffs to make the composition, the literal truth of the language will not excuse them, provided the plaintiffs were thereby deceived and defrauded.

Denny v. Gilman.

In the testimony of William Miles, it appears that he was one of the firm of Thomas Small & Co. and they did a joint business with the defendant Gilman, that he and Small, who composed the firm, were worth nothing excepting what might result from their joint business, that in June, 1837, the joint liabilities of their firm and Gilman was about $69,000, exclusive of indorsements on discounted paper, their own liabilities, in which Gilman had no interest, was about, $26,000, the joint assets belonging to the company and Gilman was about $133,000, consisting of stock on hand, notes and book accounts, considered good, doubtful and bad; about $29,000, were against persons who had failed; out of $48,000, classed as good at the time, $20,000, failed or suspended. There were accounts for leather sent out to be tanned amounting to about $30,000, of which $4,000, failed; the tanning was in a suspended state, requiring aid from the firm to complete the operation. The stock in leather, hides and wool amounted to about $26,000, in market value, but sales could not be made thereof in cash for more than $18,000 or $20,000. The concern was embarrassed during the summer of 1837 and several of their heaviest notes were renewed.

William W. Arnold deposes for the plaintiffs, that he was a clerk for Thomas Small & Co. from the spring of 1836 to the first of July, 1837, and thinks upon the whole, the company and Gilman made money over and above all losses and liabilities. But it appears further in his testimony that Small & Miles had no capital of their own, when the deponent became connected with them; that they drew out money invested by Gilman, amounting to a sum not exceeding $10,000, which in the deponent's opinion did not exceed the profits of the concern; they owed large sums of money, but had ample means, which were not then available.

From the answer of Gilman, and the evidence in the case, it is obvious, that his property as represented by Dow in January, 1837, or according to reputation was not overrated. Nor does it appear that on June 29, 1837, the nominal amount of his property had very materially diminished. By testimony of

the plaintiffs, he was represented by Dow in January, 1837, as having an amount of real estate, personal property and debts against various persons, which he valued at $196,000, exclusive of the sum, which he put into the firm of Williams & Dow. Gilman's letter dated Sept. 5, 1837, which makes a part of the answers, and which is responsive to the bill, having been read to the plaintiffs before the terms of the composition were finally agreed upon, represents that his property was in 1836, estimated by him to be worth the sum of $210,000, and it is not to be inferred that any of the various items, which composed it, had ceased to exist, excepting that he had collected something like $20,000 or $25,000 and perhaps some of the debts due to his family had been paid; he speaks of his debts, and says they look bad; his vessels had not been profitable, and could bring but little, if sold; his real estate would sell at low prices; his liabilities, exclusive of family claims, were $70,000, and $60,000 of the paper due to him was suspended. No evidence is introduced controverting in any degree the truth of these statements, or tending to show that his apprehensions at the time were exaggerated; but it is shown that he made great exertions to pay his debts, and prevent losses; he obtained the loan of small sums from his family connections; and portions of his property were under attachment. If the representations of Williams & Dow made on June 29, 1837, would bear the construction, that Gilman was insolvent, when in reality he was otherwise; or if they did create any false belief in the minds of the plaintiffs, the means of correcting those erroneous opinions and impressions were fully furnished to them before the final agreement for the compositions. It is true there might be something obtained from the investment in the firm of Small & Miles, at a future day; but it is quite manifest, if any general hope of immediate payment to the plaintiffs had been excited in their minds from that source, it would have proved delusive under the state of things then existing; and if he had given a particular detail of the affairs of that firm, it would have shown, that his connection with it would tend rather to increase his embarrassments than to have afforded the means of relief in other quarters.

It is worthy of notice, that the claim of the plaintiffs, according to the account annexed to the deposition of Lloyd, which was for merchandize, had not become payable at the time of the composition, in Sept. 1837, and that the letters of Williams & Dow, and of Gilman, show, that they regarded the result of their affairs as uncertain; that their insolvency, or ability to pay, must depend much upon information, which they did not then possess, but which they hoped would be obtained in some degree from Williams, who was then in the Western States, and the letter of June 29, expresses a wish that things should remain as they were till his return, when they hoped to settle with each, and all of their creditors in some way. A composition for a settlement, and the payment of the sum to be agreed upon, was evidently the object of the plaintiffs, and probably of the defendants, also, when it was made. It cannot be thought strange, that at a time, when there were such embarrassments to success in commercial pursuits, which threatened to continue and bring consequences worse than those, which had been realized, that the plaintiffs should have preferred to a delay with the risk, which must attend it, the certainty of the receipt of a larger portion of their claims in cash at an early day.

Unless the plaintiffs received more favorable terms in the composition, than other creditors, which does not appear, they could not have supposed, that the means of the defendants, which might be expected to be finally available, would be entirely exhausted. In the composition, they received cash, and paper payable in a short time of the same parties, who had been previously liable, with no additional security. This was, it appears, satisfactory, and no suggestion is made, that the payments were not prompt. It could not be apprehended by the plaintiffs, that all the assets of the defendants could have so soon been converted into money. The plaintiffs had the benefit of the payments made, at a time of commercial distress; they acted at the time of the composition under the guidance of the lights, which they had, without the aid of those, which subsequent events have shed around them. Both parties

were probably influenced by their fears, which were doubtless greater, than they would have been, if they could have foreseen the change, which subsequently took place. It may appear now, perhaps, that the bargain of settlement was one favorable to the defendants, and otherwise to the plaintiffs; but it is not shown to us that it was caused by a fraud practised by the former upon the latter.

*Bill dismissed with costs.*