Mr. Justice.GRIER
 

 delivered the opinion of the court.
 

 The appellants in this case filed their bill in the Circuit Court of the United States for the District of Ohio, claiming a certain tract of land in possession of the defendants, and praying a decree for. the title and possession of the same.
 

 The bill sets forth that Robert Lawson, under whom com
 
 *256
 
 plainants claim, had received for his services as an officer in the Revolutionary war a military warrant (No. 1,921) for ten thousand acres of land, which, before the 4th of June, 1794, was located in the Virginia military district, in tracts of one thousand acres each, under the following numbers of entries : 1,704, 1,705, 1,706, 1,707, 1,714, 1,715, 1,716, 1,717, 1,718, 1719.
 

 On the 4th of June, 1794, an indenture tripartite was executed between Robert Lawson, of the first part, Sarah, his wife, of the second part, and James Speed, George Thompson, Joseph Crocket, and George Nicholas, of the third part, by which, for the consideration therein expressed, Robert Lawson conveyed to thq parties of the third part, among other things, “ two thousand acres of military land, situated on White Oak Creek, on the north side of the Ohio, being the land mentioned in the first entry made for the said Lawson on the surveyor’s books," in special trust, that they will
 
 “
 
 permit said Lawson and his wife, and the survivor, and the said Sarah, if she should again separate from her husband, to use, occupy,’ possess, and enjoy, during their natural lives and the life of th survivor, the lands on Fayette county, Kentucky,”
 
 See.
 
 And also that they will convey the two thousand acres of land, on White Oak Creek to either of the sons of the marriage to whom the said Sarah shall direct,
 
 Sec.
 
 And the said Lawson covenanted with the trustees that he would, at no future time, “ offer any personal violence or injury to his wife, and that he would abstain
 
 fiom
 
 the intemperate use of every kind of spirituous liquors, and that, if he should at any time thereafter again offer any personal violence or injury to his wife,” the trustees were authorized to dispossess him of the hundred and fifty acres of land, &e.
 

 The complainants aver, also, that the two entries numbered 1,707 and 1,714 covered the two thousand acres conveyed by this deed.
 

 The bill further states, that on the 16th of August, 1796, Lawson made an assignment to one John O’Bannon of three thousand three hundred and thirty-three acres of his warrant which had not been surveyed ; and charges, that, at the time of making said assignment, Robert Lawson was, as O’Bannon well knew, habitually intemperate, and had been so for a long time previous ; that the faculties of his mind were much impaired, and that he was wholly incapable of making any valid contract; that the said assignment was without consideration, and procured by O’Bannon under false and fraudulent pretences.
 

 That O’Bannon, well knowing that the aforesaid entry of 1,707 had been conveyed by the trust deed, on the 25th of Au
 
 *257
 
 gust, 1796, fraudulently withdrew it, and reentered in his own name nine hundred and sixty-five acres under the. same nunx-ber on the waters of Straight Creek, — the tract in: controversy in the present suit. That O’Bannon, having obtained the plat and certificate,, deposited them, before the 12th of February, 1799, in the Department of State, and applied for a patent; and Joshua Lewis, the son-in-law of Lawson, as agent for the trustees, entered on that day a caveat- against the issuing of a patent to O’Bannon.
 

 Lawson and his wife lived together' but. a short time after the execution of the trust deed.. Mrs. Lawson went to Virginia, where she died in 1809, never having appointed, as provided by the trust deed, to whom conveyance should be made. Lawson died in Virginia, in 1805, the victim of intemperance. They left three children; America, intermarried with Joshua Lewis in 1797, and two sons, under whom complainants claim.' In 1800, George. Nicholas, one of the trustees, died, and some time afterwards James Speed and Joseph Crocket; and. the trust thus became vested in George Thompson, the survivor. In 1834, George .Thompson -died, leaving George C. Thompson, one of the complainants, his son and' heir at law, in whom the trust vested;
 

 John O’Bannon died in January, 1812, having made a will and appointed Robert Alexander and George T. Cotton, his son-in-law, his executors. Alexander never qualified as executor. Cotton, as acting executor, on the 16th of July, 1813, executed a deed of the nine hundred and sixty-five acres to William Lytle, under whom the defendants-daini. Tifie deed of Cotton recites a patent to John O’Bannon in his lifetime, and warrants the title. Afterwards, on the 21st of December, 1816, a patent issued from the United States to Cotton,' “ as executor of the last will and testament of John O’Bannon, in trust for the uses and purposes mentioned in his will.”
 

 The defendants plead in bar, that they are purchasers from. Lytle, and those claiming under him, without notice, and exhibit their deeds. They also file an answer in support of their •plea, in which the fraud alleged in the bill, and all facts going to show equity in the claim of complainants, are denied. And in an amended answer they set up the plea of the statute of limitations, and insist “ that the deed of trust, under which complainants claim, is a stale claim, not attended with any circumstances to relieve it from such staleness, and that the bill ¡Should be dismissed on that account.”
 

 Various questions have been made before us, as to the nature and character of this deed of trust: whether its loss is sufficiently accounted
 
 for;
 
 whether, as a settlement of family diffi
 
 *258
 
 culties, it was not abandoned by all the parties concerned in
 
 it;
 
 whether it described the land in controversy; whether O’Ban-non purchased with notice of it; whether he paid any consideration ; whether the assignment to him by Lawson was fraudulently obtained; whether the legal title was vested in defendants by virtue of the patent to Cotton and his warranty; and whether the statute of limitations, operated as a bar to complainants’ claim.
 

 On these • and other questions, which were argued with so much ability by the learned counsel, it is not the intention of the court to express an opinion; because, in our view of the case, they are not necessary to a correct decision of it.
 

 The important question is, whether the complainants axe barred by the length of time.
 

 In cases of concurrent jurisdiction, courts of equity consider themselves bound by the statutes of limitation which govern courts of law in like cases; and this rather in obedience to the statutes, than by analogy. In many other cases they act upon • the analogy of the lim tations at
 
 law;
 
 as where a legal title would in ejectment be oarred by twenty years’ adverse possession, courts of equity will act upon the like limitation, and apply it to all cases of relief sought upon equitable titles, or claims touching real estate.
 

 But there is a defence peculiar to courts of equity, founded on lapse of time and the staleness of the claim, where no statute of limitations directly governs the case. In such cases courts of equity often act upon their own inherent doctrine of discouraging, for the peace of society, antiquated demands, by refusing to interfere where there has been gross laches in prosecuting rights, or long acquiescence in the assertion of adverse rights. . (2 Story, Eq: § 1520.)
 

 A court of equity' will not give relief against conscience or public convenience where a party has slept upon his rights. “Nothing,” says Lord Camden (4 Bro. Ch. R. 640), “can call forth this court into activity but conscience, good faith, and reasonable diligence; when these are wanting, the court is passive, and does nothing.” Length of
 
 time
 
 necessarily obscures all human evidence, and deprives parties of the means of ascertaining the nature of original transactions ; it operates by way of presumption in favor of the party in possession. Long acquiescence and laches by parties out of possession are productive of much hardship and injustice to others, and cannot be. excused but by showing some actual hindrance or impediment caused by the fraud or concealment of the party in possession, which will appeal to the conscience of the chancellor. The. party guilty of such laches cannot screen his title
 
 *259
 
 from the just imputation of staleness merely by the allegation of an imaginary impediment or technical disability.
 

 This doctrine has been so often asserted by this court, that it is unnecessary to vindicate it by argument. It will be sufficient to refer to Piatt v. Vattier, 9 Peters, 405, a case much resembling the present, and Bowman
 
 v.
 
 Wathen, 1 Howard, 189.
 

 Can the complainants’ case stand the test of this reasonable and well-established rule of equity ?
 

 The bill does not assert that either the trustees or the
 
 ces-tuis que trust
 
 were ignorant of the transaction between Lawson and O’Bannon, or of the fraud practised on Lawson, if any there was. Yet, with the exception of the caveat filed in Washington, in 1799, they show no assertion of claim under this voluntary post-nuptial settlement, from its date (June, 1794) till the filing of .this bill in 1840. John O’Bannon lived till 1812; yet in all this time (sixteen years), no bill is filed to set aside his assignment from Lawson for the fraud
 
 now
 
 al-. leged, while the circumstances were fresh and capable of proof or explanation.
 

 In 1813 (perhaps in 1811) the defendants, or those under whom they claim, entered upon these lands; they paid large and valuable considerations for their respective portions, without any knowledge of this lost deed of family settlement, or reason to suspect,fraud in the transfer to O’Bannon. And whether the patent obtained by Cotton, and his warranty, had the effect of conferring on them the legal title or not, they reposed in confidence on it; By their industry and expenditure of their capital upon the land for a space of twenty-seven years, they have made it valuable; and what was a wilderness, scarce worth fifty cents an acre, is now enhanced by their labor a hundred fold.
 

 No bad faith, concealment, or fraud can be imputed to them. If the trustees or
 
 cestuis que trust
 
 chose to reside in Kentucky, and not loot after these lands for near half a century, they can have no equity from a disability that was voluntary and self-imposed. The resúfence of the trustees in Kentucky was not' considered as an obstacle or objection, in the minds of those who executed the deed, to their assuming the trust and care of lands in Ohio. There was no greater impediment to the prosecution of their claim in a court of equity at any time within forty years than there is now. They have shown nothing to mitigate the effect of their laches and long acquiescence, or which can entitle them tó call upon a court of equity to investigate the fairness of transactions after all the parties to them have been so long. in their graves, or grope after the truth of facts involved in the mist and obscurity consequent on the lapse of nearly half a century.
 

 
 *260
 
 We are all of opinion, therefore, that the lapse o? time in the present case is a complete bar to the relief sought, and that the decree of the Circuit Court dismissing the bill should be affirmed, with costs.-
 

 Ordert
 

 This cause came on to be heard on the transcript of the record from, the Circuit Court of the United States for the District of Ohio, and was argued by counsel. On consideration whereof, it is now here ordered and decreed by this court, that the decree of the said Circuit Court in this cause be and the same is .hereby affirmed, with costs.
 

 Mr. Justice McKENLEY did not sit in this cause.