MARTIN

*v.*

MARTIN, ET AL.

(Court of Chancery of Delaware.   June Term, 1900.)

*V. B. Woolley* and *J. H. Whiteman,* for complainant.

THE CHANCELLOR: This is a bill filed by the cesuti que trust to set aside an alleged fraudulent conveyance by the trustees under the will of Hugh Martin, Sr., deceased, and for an accounting. The bill was filed on the 22d day of January, A. D. 1897, and an appearance was duly entered for Edward L. Martin, surviving trustee under said will, and an appearance was subsequently entered for Willie M. Ross. On the 27th day of September, A. D. 1897, upon application of solicitors for the complainant, an order of publication for the appearance of Emma R. Martin, Luther Martin, Jr., Robert Martin, and the Fidelity Insurance & Safe Deposit Company, a corporation of the state of Pennsylvania, nonresident defendants, was made, and at the expiration of the time limited in the order for their appearance the bill was taken pro confesso against them, under rule 34, upon motion of Edward Ridgely and Charles W. Cullen, solicitors for the complainant. Subsequently the said Edward L. Martin departed this life, and Woodburn Martin, William D. Martin, and Mabel B. Martin, heirs at law, Clara Martin, widow, and Woodburn Martin, administrator of the said Edward L. Martin, deceased, were admitted to defend the suit, under the rules, and on the 24th day of February, A. D. 1899, filed their demurrer, by Robert C. White, their solicitor. The demurrer was argued by the solicitors for the complainant and the solicitor for the said Woodburn Martin, William D. Martin, and Mabel B. Martin, heirs at law, Clara Martin, widow, and Woodburn Martin, administrator of the said Edward L. Martin, deceased, before the chancellor of chambers at Dover on the 30th day of March, A. D. 1899.

The bill, after alleging that the said Hugh Martin, Sr., died seised in fee of a farm called "Woodburn", situate in Seaford Hundred, Sussex county, Del., recites his will, as follows:

"I give, devise and bequeath to my beloved wife, Sophia, all my property, real and personal of what nature and kind so ever and wheresoever the same shall be at the time of my death, during her widowhood, and in case my wife, Sophia, shall marry then my will is that she shall have one third of all my real and personal estate during her natural life, and no longer, which devise and bequest, I do

expressly declare shall be in lieu of all dower or thirds in any parts of my said estate.

"I give, devise and bequeath after the death of my said wife, Sophia, unto my sons Luther Martin and Edward L. Martin and to the survivor of them, one equal sixth part or share of my estate remaining after the payment of the legacies and bequests hereinbefore mentioned, both real and personal, to have and to hold said equal sixth part or share unto the said Luther Martin and Edward L. Martin, and the survivor of them, his heirs, executors and administrators, as joint tenants and not as tenants in common, to and for the following uses, intents and purposes, that is to say: To invest as soon after the death of my said wife, Sophia, as conveniently may be in some safe and reliable security or securities the one equal sixth part of the residue of my personal property and to pay the dividends or interest as the same shall arise or accrue therefrom to my son John Edwin during his natural life, and also to receive the rents and profits of one equal sixth part of my real estate, and from time to time to pay the same to my son John Edwin, during his natural life, and I do hereby declare that said interests or dividends and said rents or profits shall not be liable to be attached, sequestered or taken or in any way made accountable to or for any debts, liabilities, contracts or engagements of my said son John Edwin and from and after the death of my said son John Edwin the trust estate above created and vested in the said Luther Martin and Edward L. Martin and the survivor of them shall cease and determine and the said equal sixth part of the residue of my estate both real and personal shall vest in and belong to the child or children of my said son John Edwin, share and share alike, if more than one, and their heirs, executors and administrators forever, and in case my said son John Edwin shall die without leaving lawful child or children the said one sixth part of my estate devised in this item of my will shall revert to and become a part of the residue of my estate to be disposed of as hereinafter provided. If after the death of my said wife Sophia my said son John Edwin shall then be living and the said Luther Martin and Edward L. Martin shall deem it advisable to convert the said one sixth part of my real estate devised to them in trust as aforesaid into personalty, then and in that

event I do authorize and empower the said Luther Martin and Edward L. Martin or the survivor of them to sell either at public or private sale and either for cash or upon such reasonable credit well secured as to them shall seem most advisable, the said equal sixth part of my real estate or any portion of said equal sixth part so devised to them in trust as aforesaid and to sign, seal, acknowledge and deliver to the purchaser or purchasers thereof good and valid deed or deeds therefor in fee simple, clear and discharged of all trusts, liens or encumbrances, and I do order and direct the said Luther Martin and Edward L. Martin to invest the purchase money arising from said sale as soon as conveniently may be after the same shall be received by them in some safe and reliable security or securities, and to hold the same subject to the same uses, intents and purposes as above declared relative to the one sixth of the residue of my personal property during the life of the said John Edwin, and from and after his decease the same shall go to and belong to his child or children share and share alike if more than one absolutely forever.

"Item. I do give, devise and bequeath unto my five children, viz., Eliza Ann G., Luther, Hugh, David Austin and Edward Livingstone, all the rest and residue and remainder of my estate both real and personal not herein before devised or bequeathed by me to have and to hold the said residue and remainder unto them my said last named five children, their heirs, executors, administrators and assigns forever, share and share alike, in equal proportions.

"Lastly. I do hereby make, appoint and ordain my two sons Luther Martin and Edward L. Martin to be my executors of this my last will and testament and I do hereby revoke, annul and declare void all other or former wills by me at any time heretofore made hereby ratifying and declaring this and this alone to be my last will and testament."

It is then alleged that the said Hugh Martin, Sr., departed this life on the 17th day of June, A. D. 1867, leaving unrevoked this said will, and that afterwards, to wit, on or about the 17th day of November, A. D. 18——,[1] the said Sophia Martin departed this life, whereupon her estate then determined.

1. The date is left blank as given.

Letters testamentary were granted on the estate of said Hugh Martin, Sr., to Luther Martin and Edward L. Martin, and on the 14th day of November, 1867, they passed their first and final account before the register of wills, showing an unappropriated balance in their hands as executors of $2,617.

It is further alleged: "That the above-named Luther Martin and Edward L. Martin, trustees under the last will and testament of Hugh Martin, Sr., for John Edwin Martin, by their indenture of bargain and sale bearing date the 8th day of January, A. D. 1870, conveyed all the part share, right and interest, so devised to them as trustees as aforesaid of and in the said lands and premises, being one undivided sixth part thereof, unto Hugh Martin, Jr., his heirs and assigns, for the consideration stated therein, to wit, the sum of $5,487. * * * That the said Hugh Martin, Jr., by his indenture of bargain and sale, bearing date the 8th day of January, A. D. 1870, conveyed the said last above mentioned one undivided equal sixth part of said land and premises unto Edward L. Martin and Luther Martin, their heirs and assigns, as tenants in common, for the consideration stated in said deed of $100."

Both of these deeds were duly recorded.

It is further alleged: "That the above-named Eliza Ann G. Martin has since the date of the above-recited devise by Hugh Martin, Sr., intermarried with and is now the wife of Charles Wright. That the above-named Charles Wright and Eliza Wright, his wife, David A. Martin and Sarah Jane Martin, his wife, and Hugh Martin, Jr., and Sarah C. Martin, his wife, by their indenture of bargain and sale, bearing date the 8th day of January, A. D. 1870, conveyed all their parts, shares, rights, and interests of and in the said lands and premises, being in all three-sixth part or one undivided equal half part or moiety thereof unto Luther Martin and Edward L. Martin, their heirs and assigns, as tenants in common."

The bill further alleges the death of the said Luther Martin on the 18th day of July, A. D. 1888, and that under and by virtue of authority of his will the said Emma R. Martin, Luther Martin, Jr., Robert W. Martin, and the Fidelity Insurance & Safe Deposit Com-

pany, a corporation of the state of Pennsylvania, did on the 8th day of February, A. D. 1894, convey a tract of land, which was a part of the lands of which the said Hugh Martin, Sr., died seised, to Willie M. Ross, of Seaford, one of the defendants, and alleges that the remaining parts of which the said Hugh Martin, Sr., died seised and possessed are held by and in the possession of Edward L. Martin.

It is then alleged: "That the said deed of Luther Martin and Edward L. Martin, trustees as aforesaid, to Hugh Martin, Jr., as well as the said deed of Hugh Martin, Jr., to the said Luther Martin and Edward L. Martin, were fraudulent and void, inasmuch as no consideration was ever paid for said lands, and that said conveyances were in gross and palpable violations of the trusts reposed by the said testator in the said trustees, thereby making invalid and void any title which the said Willie M. Ross claims in said lands. That the said deeds so as aforesaid made, conveying, or purporting to convey, any of the lands held by the said Luther Martin and Edward L. Martin, trustees as aforesaid, was in open violation of the trust so as aforesaid created by said Hugh Martin, Sr., now deceased, and the deed made to the said Willie M. Ross carried no interest in said lands by reason of the said fraud and violation of the trust aforesaid."

And finally the complainant avers: "That the said Luther Martin and Edward L. Martin, or either of them, have never invested any property or funds, so devised them as aforesaid, in any security or securities for the benefit of your orator, but, on the contrary, have entirely ignored and disregarded the provisions in said will contained, and entirely wasted the interest of the said John E. Martin."

The prayers were for a full accounting, the removal of Edward L. Martin, surviving trustee as aforesaid, and "that one equal sixth part of the lands and tenements of which the said Hugh Martin, Sr., died seised, may be decreed to be subject to the trust contained in the last will and testament of the said Hugh Martin, Sr., for the use and benefit of your complainant during his lifetime, and for the use and benefit of your complainant's children after his death, and that the said one equal sixth part of the said lands and tenements may be decreed to be conveyed by the present pretended owners and holders

of said real estate to such new trustee or trustees as may be appointed by the chancellor and upon the trust mentioned and contained in the said last will and testament of the said Hugh Martin, Sr., deceased." Also, "that the said deed of Luther Martin and Edward L. Martin, trustees as aforesaid to Hugh Martin, Jr., the deed from Hugh Martin, Jr., to Luther Martin and Edward L. Martin may be declared null and void as well as the said deed of Edward L. Martin and wife to the said Willie M. Ross."

There are several grounds of demurrer; but the only one which it is necessary to consider is that which raised the defense of laches or lapse of time.

It appears from the foregoing that the bill, after describing the terms of the trust, alleges, in substance, acts and conduct on the part of the trustees amounting to absolute repudiation of the trust in the year 1870, more than 26 years before the filing of the bill, and the continued use and treatment of the estate by the trustees thenceforth as their own. No allegation appears in the bill of any circumstance to avoid the effect of the lapse of time on the complainant's standing in a court of equity, or to explain or give reasons for his prolonged acquiescence or laches, and it is on this ground that the demurrer must be sustained, if at all.

The defense of the statute of limitations is not urged, and it is not necessary to consider it, as it is the settled doctrine of courts of equity that they will not consider stale claims where the laches or acquiescence of the complainant is not explained.

The general rule is stated by Story, as follows: "Courts of equity have established the doctrine that after a long lapse of time, or long peaceable possession, they ought not to interfere to give relief; for the policy of the law is to give quiet and repose to titles, and courts of justice ought not to countenance laches or long delays on the part of claimants." Sto. Eq. Pl. § 813(3). A note to this paragraph cites the old English and a few American cases, as follows: *Cholmondeley v. Clinton*, 2 Jac. & Walk. 1, 163-175, 192; Mitf. Eq. Pl. by Jeremy. 273, note "z"; *Campbell v. Graham*, 1 Russ. & Myl. 453; *Clay v. Smith, Ambler*, 645, 3 Bro.Ch. 639; *Hercy v. Dinwoody*, 2 Ves. Jr.

87; *Ellison v. Moffat,* 1 *Johns.Ch.* (*N.Y.*) 46; *Arden v. Arden,* 1 *Johns.Ch.* (*N.Y.*) 313; *Elmendorf v. Taylor,* 10 Wheat. 152, 6 *L.Ed.* 289; *Baldwin v. Peach,* 1 *Y. & Coll.* 453, 460; *Brooksbank v. Smith,* 2 *Y. & Coll.* 58; *Gait v. Osbaldeston,* 1 *Russ.* 158; *Bradt v. Kirkpatrick,* 7 *Paige* (*N.Y.*) 62; 2 *Story, Eq. Jur.* §§ 1520-1522, and notes.

The rule applies also to trusts, except when the facts have been fraudulently and successfully concealed from the cestui que trust; but in those cases "the cestui que trust must set forth specifically in his bill the impediment to an early prosecution of the claim, what kept him so long ignorant of his right, the means used by the trustee to conceal the facts from him, and how and when he came to a knowledge of his rights," citing: *Badger v. Badger,* 2 *Wall.* 87, 17 *L.Ed.* 836; *Id.,* 2 *Cliff.* 137, 154, *Fed. Cas. No.* 718; *Wood v. Carpenter,* 101 *U.S.* 135, 25 *L.Ed.* 807; and other cases.

In *Piatt v. Vattier et al.,* 9 *Pet.* 415, 9 *L.Ed.* 173, Justice Story states the established doctrine, as follows: "And we are of opinion that the lapse of time is, upon the principles of a court of equity, a clear bar to the present suit, independently of the statute. There has been a clear adverse possession of 30 years, without the acknowledgment of any equity or trust estate in Bartle; and no circumstances are stated in the bill, or shown in the evidence, which overcome the decisive influence of such an adverse possession. The established doctrine, or, as Lord Redesdale phrased it in *Hovenden v. Annesley,* 2 *Sch. & Lef.* 637, 638, 'the law of courts of equity,' from its being a rule adopted by those courts, independent of any positive legislative limitations, is that it will not entertain stale demands. Lord Camden, in *Smith v. Clay,* 3 *Brown's Ch. Rep.* 640, note, stated it in a very pointed manner. 'A court of equity,' said he, 'which is never active in relief against conscience or public convenience, has always refused its aid to stale demands, where the party has slept upon his rights, or acquiesced for a great length of time. Nothing can call forth this court into activity but conscience, good faith, and reasonable diligence. Where these are wanting, the court is passive and does nothing; laches and neglect are always discountenanced; and therefore from the beginning of this jurisdiction there was always a limi-

tation of suits in this court.' The same doctrine has been repeatedly recognized in the British courts, as will abundantly appear from the cases already cited, as well as from the great case of *Cholmondeley v. Clinton,* 2 Jac. & Walk. 1(*a*). It has also repeatedly received the sanction of the American courts, and was largely discussed in *Kane v. Bloodgood,* 7 *Johns.Ch.* [*N.Y.*] 93 [11 *Am. Dec.* 417], and *Decouche v. Savatier,* 3 *Johns.Ch.* [*N.Y.*] 190 [8 *Am. Dec.* 478]. And it has been acted on in the fullest manner by this court, especially in the cases of *Prevost v. Gratz,* 6 *Wheat.* 481, 5 *Cond. Rep.* 142 [5 *L.Ed.* 311], *Hughes v. Edwards,* 9 *Wheat.* 489, 5 *Cond. Rep.* 648 [6 *L.Ed.* 142], *Willison v. Watkins,* 3 *Pet.* 44 [7 *L.Ed.* 596], and *Miller v. McIntyre,* 6 *Pet.* 61, 66 [8 *L.Ed.* 320]. Without therefore going at large into the grounds upon which this doctrine is established, though it admits of the most ample vindication and support, we are all of opinion that the lapse of time in the present case is a complete bar to the relief sought, and that the decree of the Circuit Court, dismissing the bill, ought to be affirmed, with costs."

In *Piatt v. Vattier* there was an answer, and, before the general principle can be applied to the present case, it will be necessary to consider whether this defense is properly made by demurrer. Mitford states that it cannot (*Mitf. Eq. Pl.* 212), and cites Lord Thurlow's famous case. *Lord Deloraine v. Browne,* 3 *Bro. C.C.* 633. Mitford's treatise is, in general, conclusive authority in this jurisdiction; but, subsequently, when he was Lord Chancellor of Ireland, he decided the leading case of *Hovenden v. Lord Annesley,* 2 *Sch. & Lef.* 636, and therein declined to follow Lord Thurlow's rendering a decision directly contrary to the text of his treatise and to Lord Thurlow's judgment in the very case which as treatise writer he had felt compelled to cite as controlling authority.

Judge Story collects the authorities usually cited at the time he wrote, and also comments on the change in Lord Redesdale's statement of the rule, in *Sto. Eq. Pl.* § 503, note 3, as follows: "Cooper, *Eq. Pl.* 167; *Mitf. Eq. Pl. by Jeremy,* 212, and note 'c'; post, § 751; *Aggas v. Pickerell,* 3 *Atk.* 225; *Hardy v. Reeves,* 4 *Ves.* 479; *Deloraine v. Browne,* 3 *Bro.Ch.* 633, and Mr. Belt's note 1; *Foster v. Hodgson,* 19 *Ves.* 180; *Hovenden v. Annesley,* 2 *Sch. & Lefr.* 637;

*Hoar v. Peck,* 6 *Sim.* 51; *Freake v. Cranefeldt,* 3 *Myl. & Cr.* 499; *Fyson v. Pole,* 3 *Y. & Coll.* 266; *Humbert v. Trinity Church,* 7 *Paige* [*N.Y.*] 195; *Van Hook v. Whitlock,* 7 *Paige* [*N.Y.*] 373; *Coster v. Murray,* 5 *Johns.Ch.* [*N.Y.*] 522; *Denny v. Gilman,* 26 *Me.* 149; *Maxwell v. Kennedy,* 8 *How.* 222 [12 *L.Ed.* 1051]. Lord Redesdale, in his text, has said that it has been considered that a defense, founded on the length of time, though apparent on the face of the bill, without any circumstance stated to avoid it, cannot generally be made by demurrer. In so doing, he seems to have followed what appeared at the time when he wrote his treatise to be the prevailing course of authority. And he has illustrated the position by an accurate statement of what was decided by Lord Thurlow in *Deloraine v. Browne,* 3 *Bro.Ch.* 633. But the contrary doctrine is now fully established by the authorities above cited, and especially by Lord Redesdale's own judgment in *Hovenden v. Annesley,* 2 *Sch. & Lefr.* 636-638 (*Caldwell v. Montgomery,* 8 *Ga.* 106; *Pierson v. David,* 1 *Iowa* 23). Ante, § 484"—which section applies to the statute of limitations.

In *Speidel v. Henrici,* 120 *U.S.* 387, 7 *Sup.Ct.* 612, 30 *L.Ed.* 718, the defense was made by demurrer, and the modern rule is stated by Justice Gray, delivering the opinion of the court, as follows: "When the bill shows upon its face that the plaintiff, by reason of lapse of time and of his own laches, is not entitled to relief, the objection may be taken by demurrer"—citing: *Maxwell v. Kennedy,* 8 *How.* 210, 12 *L.Ed.* 1051; *National Bank v. Carpenter,* 101 *U.S.* 567, 25 *L.Ed.* 815; *Lansden v. Smith,* 106 *U.S.* 391, 1 *Sup.Ct.* 350, 27 *L.Ed.* 219.

In the preceding paragraph of Justice Gray's opinion, the language of Lord Camden, given above in the citation of *Piatt v. Vattier,* is quoted, and a full list given of Supreme Court cases upon laches or lapse of time. But the whole doctrine of laches in equity is authoritatively laid down in our own state in *Perkins v. Cartmell's Adm'r,* 4 *Har.* 270, 276, 42 *Am. Dec.* 753, a case in which the chancellor was overruled on appeal, and the Court of Errors and Appeals. Chief Justice Booth delivering the opinion of the court, used the following language: "(2) This suit is barred by lapse of time independ-

ently of the statutes of limitation, upon the presumption of payment and satisfaction, which presumption is not rebutted. The defense founded upon mere lapse of time and the staleness of the claim, in cases where no statute of limitation directly governs the case, is said by Judge Story (2 *Comm. on Equity Jurisprudence,* § 1520, p. 904) to be a defense peculiar to courts of equity. Upon general principles of their own, independently of the statutes of limitation, they have always discountenanced laches and neglect, and refused their aid to stale demands where the party has slept upon his right, or acquiesced, for a great length of time. They are never active in relief against conscience or public convenience. After a considerable lapse of time, they refused to interfere, from considerations of public policy and the difficulty of doing entire justice when the original transactions have become obscure by time and the evidence may be lost. This is their established doctrine. 2 *Story's Equity Jurisprudence,* § 1520, and notes; *Smith v. Clay,* 3 *Bro. C.C.* 640, note; *Piatt v. Vattier,* 9 *Pet.* 416 [9 *L.Ed.* 173], and cases cited; *McKnight v. Taylor,* 1 How. 168 [11 *L.Ed.* 86]. In all cases in equity, where the statutes of limitation do not operate, suits are barred by lapse of time: (1) Upon the ground of public policy, the peace of society, the inconvenience of the relief, or that it is against conscience or good faith. (2) Where the presumption arises of something having been done, which is adverse and destructive to the plaintiff's demand. Every reasonable presumption is made from lapse of time which the circumstance of the case will fairly admit. For example, in the case of an express or direct trust, as between the cestui que trust and trustee, there is no bar by the statute of limitation, and, so long as the trust is admitted by the acts or declarations of the parties, there is no bar by lapse of time. But if the trustee disclaims, disavows, or denies the right of the cestui que trust, and the latter acquiesces for a great length of time, as, for instance, in the case of real estate for a period of 20 years, a court of equity will presume an extinguishment of the trust. *Kane v. Bloodgood, 7 Johns.Ch.* [*N.Y.*] 123, 124 [11 *Am. Dec.* 417]; *Willison v. Watkins,* 3 *Pet.* 48, 52 [7 *L.Ed.* 596]; *Boone v. Chiles,* 10 *Pet.* 223 [9 *L.Ed.* 388]."

In view of the preceding citations, it is perhaps unnecessary to prolong this discussion; but the point of pleading involved concerns

the fundamental rules of our system of equity pleadings, and there has been a singular oscillation in the view taken of it by the Court of Chancery, the most distinguished English Chancellors arriving at directly opposite conclusions. It would seem therefore that, inasmuch as the question has never been passed upon in the Court of Chancery of this state, it might not be inappropriate to review briefly the series of decisions.

Langdell, an author profoundly versed in the civil and the canon law, upon which our system of equity pleading is based, has presented in the strongest possible form the arrangements in favor of the view prevailing when Mitford, quoted *supra,* wrote his treatise on equity pleading. At the same time he has reviewed the history of the English cases prior to Lord Redesdale's decision in *Hovenden v. Lord Annesley* with such admirable brevity and precision, that I will quote the whole section in which he treats it:

"It was long a vexed question whether it was a good ground for demurrer to a bill in equity that it appeared upon its· face that the claim accrued at least six years or twenty years (as the case might be) before the bill was filed. Lord Hardwicke decided it in the negative, and gave (what is conceived to be) a conclusive reason for his decision, namely, that to allow a demurrer in such a case would have the effect of depriving the plaintiff of his right to reply (*Aggas v. Pickerell,* 3 *Atk.* 225; *Gregor v. Molesworth,* 2 *Ves.* 109), and he was followed by Lord Thurlow (*Deloraine v. Browne,* 3 *Bro. C.C.* 633 [*Eden's Ed.*]; *Edsell v. Buchanan,* 2 *Ves. Jr.* 83, 4 *Bro. C.C.* 254). Previously, however, it had been decided in the affirmative both by Lord King (*Jenner v. Tracy,* 3 *P. Wms.* 287, in notes), and by Lord Talbot (*Belch v. Hervey, Id.; Sugden, Vendors* [*7th Ed.*] 790), and their views were adopted by Lord Kenyon (*Beck v. Close,* cited 3 *Bro. C.C.* 644, 5 *Ves.* 476, 19 *Ves.* 184), and Lord Eldon, and came to be regarded (*Foster v. Hodgson,* 19 *Ves.* 180) as the settled doctrine of the court (*Hodle v. Healey,* 1 *V. & B.* 536; *Hoare v. Peck,* 6 *Sim.* 51; *Smith v. Fox,* 6 *Hare,* 386. And see *Frazer v. Moor, Bunb.* 54; *Cas. in Eq. Pl.* 36; *Prance v. Sympson, Kay,* 678).

"The question chiefly arose in a single class of cases, namely, upon bills by mortgagors against mortgagees in possession to redeem.

As it was a chief object of such a bill to compel the mortgagee to account for the rents and profits of the mortgaged property during the time that he had been in possession, of course the bill naturally stated how long the mortgagee had been in possession, and, if it thus appeared that he had been in possession 20 years or more, it was held (according to prevailing view) that the plaintiff stated himself out of court, unless he further stated some good reason why he was not barred by lapse of time. But the statement of such a reason would constitute an anticipatory replication; and if such a replication be necessary, in the case supposed, to save the bill from a demurrer, it will follow that it is necessary in every case where the bill anticipates an affirmative defense and admits it to be true. Such a rule would involve the absurdity of permitting a defendant to demur, not for the insufficiency of a replication, but for want of one—a thing which would be not only absurd, but impossible without changing the nature of a demurrer. Indeed, the only thing that can be demurred to in equity is the bill proper. A bill can never be demurred to because it contains an insufficient replication. If a bill does not contain a good replication, there is no ground for saying that it contains a replication at all, i.e., that any of the matter contained in the bill was inserted as a replication. Moreover, a plaintiff never loses his right to reply to a defense until the defense is actually set up, either by plea or answer; for the moment that a defense is so set up, the plaintiff has a right to amend his bill for the purpose of replying to the defense. To permit a defendant to demur, therefore, in the case supposed, is inconsistent with the plaintiff's right to amend his bill.

"For these reasons, it seems that the rule under consideration (assuming the prevailing view to have amounted to a rule) must be regarded as an anomaly; and it seems also that the judicature acts have gotten rid of this anomaly in England. [See: Order 19, Rule 18; *Dawkins v. Lord Penrhyn*, 6 *Ch.D.* 318, 4 *App. Cas.* 511 (in which defenses under 3 & 4 *Wm.. IV*, c. 27, were sharply distinguished from defenses under 21 *Jac. I*, c. 16, § 3); *Wakalee v. Davis*, 25 W.R. 60. But see, contra, *Noyes v. Crawley*, 10 *Ch.D.* 31.] Indeed, such a rule could never have been supported with even a semblance of plausibility, but for the fact that in equity the replication was incorporated with the bill." *Langdell, Eq. Pl.* § 129.

The English view since Lord Redesdale, which is unquestionably the modern American doctrine and must be recognized by the court as controlling, is fully set forth in *Lansdale v. Smith*, 106 *U.S.* 392, 393, 1 *Sup.Ct.* 350, 27 *L.Ed.* 219. Many of the authorities already cited are reviewed and quoted in the opinion; but, although it involves some repetition, I will give the language in full, as it is the most complete exposition of the rulings of the United States Supreme Court upon this point. After stating the case, Mr. Justice Harlan delivered the opinion of the court, as follows:

"It has been a recognized doctrine of courts of equity, from the very beginning of their jurisdiction, to withhold relief from those who have delayed for an unreasonable length of time in asserting their claims. *Elmendorf v. Taylor*, 10 *Wheat.* 152 [6 *L.Ed.* 289]; *Piatt v. Vattier*, 9 *Pet.* 405 [9 *L.Ed.* 173]; *Maxwell v. Kennedy*, 8 *How.* 210 [12 *L.Ed.* 1051]; *Badger v. Badger*, 2 *Wall.* 87 [17 *L.Ed.* 836]; *Cholmondeley v. Clinton*, 2 *Jac. & W.* 1; 2 *Story, Eq. Jur.* § 1520. In *Wagner v. Baird*, 7 *How.* 234 [12 *L.Ed.* 681], it was said that long acquiescence and laches by parties out of possession are productive of much hardship and injustice to others, and cannot be excused by showing some actual hindrance or impediment, caused by the fraud or concealment of the party in possession, which will appeal to the conscience of the chancellor.

"And, contrary to the view pressed in argument, a defense grounded upon the staleness of the claim asserted, or upon the gross laches of the party asserting it, may be made by demurrer, not, necessarily, by plea or answer. A different rule has been announced by some authors, and in some adjudged cases; generally, however, upon the authority of the case of *Earl of Deloraine v. Browne*, 3 *Bro. C.C.* 633. Lord Thurlow who decided that case, is reported to have declared, when overruling a demurrer to a bill charging fraudulent representations as to the value of an estate, and praying an account of rents, profits, etc., that his action was based upon the ground that length of time, proprio jure, was no reason for a demurrer; that it was only a conclusion from facts, showing acquiescence, and was not matter of law; and that he could not allow a party to avail himself of an inference from facts on a demurrer. But in *Hovenden v. Lord*

*Annesley, 2 Sch. & Lef.* 607, decided in 1806, Lord Redesdale expressed his disapproval of the decision of Lord Thurlow, as reported by Brown, and said that it was rendered in a hurry, when the latter was about to surrender the seals, and when much injury might have been done to parties had judgments not been given before the latter retired from office. The rule, as announced in *Hovenden v. Lord Annesley,* was: 'That when a party does not by his bill bring himself within the rule of the court, the other party may by demurrer demand judgment, whether he ought to be compelled to answer. If the case of the plaintiff, as stated in the bill, will not entitle him to a decree, the judgment of the court may be required by demurrer, whether the defendant ought to be compelled to answer the bill.' That, the court said, was matter of the law of a court of equity, to be determined according to its rules and principles.

"Such is, undoubtedly, the established doctrine of this court as announced in many cases. In *Maxwell v. Kennedy, supra,* the court, speaking by Mr. Chief Justice Taney, approved the rule as announced by Lord Redesdale. After referring to *Piatt v. Vattier, supra,* and to *McKnight v. Taylor,* 1 *How.* 161 [11 *L.Ed.* 86], and *Bowman v. Wathen,* 1 *How.* 189 [11 *L.Ed.* 97], it was said that: 'The proper rule of pleading would seem to be that, when the case stated by the bill appears to be one in which a court of equity will refuse its aid, the defendant should be permitted to resist it by demurrer. And as the laches of the complainant in asserting his claim is a bar in equity, if that objection is apparent on the bill itself, there can be no good reason for requiring a plea or answer to bring it to the notice of the court.' In the more recent case of *Badger v. Badger, supra,* the court, speaking by Mr. Justice Grier, said that a party, who makes an appeal to the conscience of the chancellor, 'should set forth in his bill specifically what were the impediments to an earlier prosecution of his claim; how he came to be so long ignorant of his rights, and the means used by the respondent to fraudulently keep him in ignorance; and how and when he first came to a knowledge of the matters alleged in his bill. Otherwise the chancellor may justly refuse to consider his case, on his own showing, without inquiry whether there is a demurrer or formal plea of the statute of limitations contained in the answer.' Page 95 [2 *Wall.* (17 *L.Ed.* 836)]."

It is so manifest that the case presented by the bill is within the principles laid down by the authorities which I have quoted so freely that it is useless to restate or analyze it, and it therefore follows that the demurrer must be sustained, with leave to the complainant to amend his bill, if he should so desire, and without prejudice to the filing of a new bill.

Note. The bill of complaint in this case was afterwards dismissed upon the application of the complainant.