## SPEIDEL v. HENRICI.

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE WESTERN DISTRICT OF PENNSYLVANIA.

Argued December 14, 1886. — Decided March 7, 1887.

The general rule that express trusts are not within the statute of limitations does not apply to a trust openly disavowed by the trustee with the knowledge of the cestui que trust.

Implied trusts are barred by lapse of time.

A court of equity will not assist one who has slept upon his rights, and shows no excuse for his laches in asserting them.

If a bill in equity shows upon its face that the plaintiff, by reason of lapse of time and of his own laches, is not entitled to relief, the objection may be taken by demurrer.

A bill in equity against persons holding a fund avowedly in trust for the common benefit of the members of a voluntary association, living together as a community and subject to its regulations, cannot, whether the trust is lawful or unlawful, be maintained by one who has left the community, and for fifty years afterwards taken no step to claim any interest in the fund.

THIS was a bill in equity, filed June 7, 1882, by Elias Speidel, a citizen of Ohio, against Jacob Henrici and Jonathan Lenz, trustees of the Harmony Society of Beaver County in the State of Pennsylvania, and citizens of Pennsylvania, and containing the following allegations:

That the plaintiff's parents lived in the kingdom of Wurtemburg in Germany up to the year 1804, " engaged in farming and well to do, and without any education or knowledge of the world or of business, but devout Christians, members of the Established Protestant Church of that country, and earnest seekers after spiritual light and their salvation."

That at the same time there lived in the same neighbor-

hood one George Rapp, "a farmer and vintner; \` an education superior. to that of the plaintiff's parents and of the simple farming people of that country, and who was a person of great intellectual power, clear-sighted, sharp-witted, eager for superiority, and a born leader of men."

That about 1800 Rapp, without license or ordination, and in violation of law, began to preach clandestinely to his countrymen, including the plaintiff's parents, and "preached to them the doctrine that the Lord had chosen him as their spiritual leader, that the second advent of Christ and the beginning of the millennium, as taught by the Revelation of St. John, was near at hand, and that, in order to be saved from eternal damnation, it would be necessary for them to separate from the established church of their country, to form a settlement by themselves under his guidance and control, and thus fit themselves for the second coming of Christ and accomplish their salvation."

That Rapp, "by means of such clandestine teachings, and by the exercise of strong will power over the weaker minds of his said disciples, obtained such overpowering influence over about three hundred families of them," including the plaintiff's parents, that he caused them to separate from their established church, to believe in and accept Rapp as their only spiritual leader and as a necessary medium of their salvation, and to believe that it was necessary for their salvation that they should sell all their land and possessions for cash in hand, leave their country and friends, and, "as the chosen of the Lord, form a colony by themselves, either in the Holy Land or in the United States of America, in which places Christ would first reappear on earth;" that during the year 1804 and 1805, "in pretended furtherance of the said pretended plan of their salvation," Rapp made about one hundred and twenty-five families of them, the plaintiff's parents included, sell all their land and possessions, emigrate to the United States, and settle near Zelienople, in Butler County, in the State of Pennsylvania, upon a wild, uncultivated tract of land, selected by said Rapp and by him called Harmony, "where the plaintiff was born, in the year 1807, and where he was raised;" and

there "they formed a colony or voluntary association, called and known as the Harmony Society, and were made by said Rapp and became wholly subject to his absolute power and control in both spiritual and temporal affairs."

That, up to their arrival at Harmony, the heads of said families had severally paid their own expenses, and had kept, and had intended to keep, their several means as their own, and to live each family by itself; "but when said Rapp had succeeded in bringing them to said Butler County, and in separating them from their home and friends, he fraudulently and corruptly conceived the scheme to take advantage of their ignorance and helplessness, and of their blind reliance upon him as the prophet of the Lord, and the Lord's chosen mouthpiece in guiding them to salvation; for the purpose of gratifying his fierce ambition and lust of power, by acquiring unrestricted dominion over the money and means and mode of living of his followers, and by reducing them to abject dependence upon his irresponsible will;" and "in furtherance of this scheme, falsely and fraudulently pretended to his said followers, the plaintiff's parents included, that they could not and would not be saved from eternal damnation, except that they would renounce their plan of establishing a separate and exclusive home for each family in said settlement, and that they would yield up all their possessions, the same as it had been done by the early Christians, according to the fourth chapter of the Acts of the Apostles, and that they would lay their said possessions at the feet of said Rapp as their apostle, to be placed into a common fund of said Harmony Society, in the keeping of said Rapp as their trustee, and that they would live thenceforth as a community or a common household with all the rest of the followers of said Rapp, and submit themselves and their families to the control of said Rapp to do for said community such work as he should direct, the avails thereof to form part of said common fund, relinquishing to him and to his successors in the leadership of said community the management of all of said trust funds and the disposition of their own persons and those of their wives and children, and they receiving only the necessaries of life in return; but

that said Rapp knew better, and did not honestly believe any of the foregoing things to be necessary to their salvation."

That "all of said families, the parents of the plaintiff included, induced by and relying upon the said false and fraudulent representations, and believing that they would be eternally damned unless they should obey the said teachings of said Rapp, immediately, in the year 1805, yielded up all their possessions to the said common fund of said Harmony Society, the parents of the plaintiff contributing thereto the sum of about one thousand dollars, and placed said fund into the keeping of said Rapp as their trustee, and lived thenceforth as a community or a common household with all the rest of the followers of said Rapp, and submitted themselves and their families to the control of said Rapp to do for said community such work as he directed, and allowed the avails thereof to form part of said common fund, and relinquished to him and his successors in the leadership of said community the management of all of said trust funds and the disposition of their own persons and those of their wives and children, and they received only the necessaries of life in return, for none of which they, or any of them, ever received or were promised any other consideration than the pretence that, by complying with the said teachings of said Rapp, they would not be damned, and that, as the chosen of the Lord, they would be led by him as their prophet, priest and king to eternal salvation."

That "said Rapp received and accepted said trust fund and the contributions of the parents of the plaintiff thereto, and all the profits and interest, and all the accretions of said fund by the work of the plaintiff and of the other inhabitants of said community and otherwise, not as his own, but in trust for the members of said families and the contributors of said fund and for their common benefit, and always, up to his death, recognized and acknowledged said trust, and disclaimed any greater interest in said funds than that of any other contributor thereto, and any other right to the management and control of said funds than by virtue of his pretended apostolic leadership of said community."

That in 1807 Rapp, " for the purpose of breaking up among

them the last tie which could have caused them to have interests of their own separate from those of the said community at large and conflicting with his absolute dominion over their fortune and mode of life, and over their bodies and those of their wives and children, and as a part of his said fraudulent and corrupt scheme," "falsely and fraudulently pretended to his said followers, the plaintiff's parents included, that there had been no difference of the sexes nor any seed of death in man until both were brought about by original sin;" "that all intercourse of the sexes, even in wedlock, was polluting, and that they could not and would not be saved from eternal damnation except by abjuration of matrimony and of all sexual indulgence on the part of those of his followers who were still single, and by a cessation of all conjugal intercourse on the part of those of his followers who were already married; but that said Rapp knew better, and did not honestly believe in said statements; that all of the married persons of said community, the parents of the plaintiff included, induced by and relying upon the said false and fraudulent representations, and believing that they would otherwise be eternally damned, immediately ceased to have any further conjugal intercourse, and thenceforth lived as if single, and those who were single abjured matrimony and all sexual indulgence."

That the plaintiff "was raised in and as a part of said community, and, in common with the younger members of the families forming the same, was taught from his earliest infancy by Rapp to believe, and by reason of said teachings did believe" in the doctrines proprounded by Rapp as aforesaid, and "continuously, faithfully and diligently worked in and for said community, under the control and direction of said Rapp, from the age of twelve years until the age of twenty-four years, in all for the full term of twelve years, and allowed the avails of his said work to form, and they did become and now are, part of said common fund; and the plaintiff contributed to said fund his time, attention and skill, and increased the wealth and promoted the interests of said community, and received nothing more in return than the bare necessaries of life for the said term of twelve years, and no longer, which

were of far less value than the avails of his said work, for none of which he received any other consideration than the pretence that by complying with the said teachings of said Rapp he would not be damned, and that, as one of the chosen of the Lord, the plaintiff would be led by said Rapp as his prophet, priest and king to eternal salvation;" and that his contributions to the said fund, after deducting therefrom the value of the necessaries of life so received by him, were largely in excess of the sum and value of three hundred dollars, and by the interest and profit on their investment in said fund now largely exceeded the sum and value of over thirty thousand dollars.

That in 1815 the community, including the plaintiff, and his parents, removed to Posey County, in the State of Indiana, where, in 1816, both the plaintiff's parents died; and that in 1825 the community, including the plaintiff, removed thence to Beaver County, in the State of Pennsylvania, where it has ever since remained.

That Rapp ruled over the community continuously from 1805 until his death in 1847 with absolute dominion, making the only laws or rules that were allowed to govern it, teaching and making them all believe that "whoever broke any of said laws or rules committed the unpardonable sin, the sin against the Holy Ghost, which would neither be forgiven here nor in the other world;" forbidding the use of tobacco; determining "the character and amount of victuals to be supplied from the common store to the inmates of the community, and the material and cut of the dress of all males and females therein, and the hours of labor, rest, and eating;" sitting as sole judge and jury to try all charges against them, fixing the punishment at will, by putting on a diet of bread and water, excluding from church for a time, or reprimanding or expelling, without action of the community, or hearing or appeal; making them confess their sins to him, "invariably, and as a necessary condition of receiving the forgiveness of the Lord;" not permitting them to acquire any knowledge of the English language, or to have access to English books or papers; forbidding them, on pain of damnation, to associate with or to visit any but

inmates of the community; not allowing them to have any money or to buy or sell on their own account, threatening them for any disobedience with the punishment of Ananias and Sapphira; permitting them to become citizens of the United States, but compelling them to vote at elections for the candidate whom he selected; repeatedly and corruptly making some of them forge the names of dead persons to legal instruments, and sign and swear to false statements, he knowing them to be false; that during all this time his management of said trust funds was selfish and rapacious; that in 1818 he destroyed the records of the original contributions made by the heads of families in 1805, for the avowed purpose of preventing the young people from finding out about them; that he studiously and fraudulently concealed from the contributors to said trust funds all his money transactions, and habitually destroyed the records thereof, and in 1845 gathered up out of the said trust fund and secreted the sum of five hundred and ten thousand dollars in coin.

That "the whole of the said system of said Rapp was repugnant to public policy and the laws of the land, and more especially in this: that no inmate of said community was permitted by said Rapp to marry therein, and that whoever was about to enter into the married state was compelled by said Rapp to leave said community; and that the plaintiff, in the year 1831, being about to enter into the married state, had to leave and did leave said community, although said Rapp did permit, as an exception, a few of his favorites to marry in said community and to remain therein; and until after the plaintiff so left said community he was kept under such duress and restraint by the iron rule of said Rapp that he did not know, and had no means of ascertaining, the iniquity and degradation thereof and the impious and blasphemous character of the teachings of said Rapp."

That the said trust fund so received and accepted by Rapp, by profits, interest and accretions, had become of the value exceeding eight million dollars, and the net profits thereof for many years and now exceeded the sum of two hundred thousand dollars annually; that at the death of Rapp one Rome-

lius L. Baker and the defendant Henrici succeeded him as
trustees of said trust, and at the death. of Baker, in 1868, the
defendants succeeded Baker and Henrici as trustees of said
trust and managers of all the estate of the Harmony Society;
and that Baker and Henrici, while such trustees, and the de-
fendants ever since, "received and accepted the said trust fund,
and all the profits and interest thereof, and all accretions of
said fund received by them, not as their own, but in the same
trust in which said Rapp had held said fund, and always recog-
nized and acknowledged said trust, and always disclaimed
any greater interest in said fund than any other contributor
thereto; that the plaintiff did not know and had no means of
ascertaining the names and places of abode of the other par-
ties interested in said fund, but they were very numerous and
their interest is common with his; and that neither Rapp nor
either of the defendants ever rendered to the plaintiff, or to
any of the beneficiaries of said fund, any account of their
trust, although the plaintiff demanded an account of them and
a settlement of his share therein before the bringing of this
suit in May, 1882.

"The prayer of the bill was " that said trust be rescinded and
held for naught, as resting upon fraud and iniquity and being
contrary to public policy and the laws of the land; that the
persons interested in its assets be remitted to their original
rights, the plaintiff included; that the defendants discover the
names and places of abode of the other parties interested in
the funds and property under the control of the defendants,
for the purpose that they may be brought before the court;
that an account be taken of the said trust and assets and of
the share of the plaintiff therein; that he have compensation
for his contributions to said trust and to its assets; that a dis-
tribution of said assets be had, and that the plaintiff receive
his share therein;" and for further relief.

The defendants demurred to the bill, and assigned the fol-
lowing causes of demurrer:

"1st. That it appears in and by said bill that more than
fifty years have elapsed since the said alleged cause of com-
plaint occurred to the plaintiff, whereby said cause of com-

plaint hath become barred by the statute of limitations in such cases made and provided.

"2d. That it appears in and by said bill of complaint that the causes of complaint are stale, and that so long a time has passed since the matters and things complained of took place that it would be contrary to equity and good conscience for a court to take cognizance thereof, or to enforce any further or other answer thereto.

"3d. That no case is stated in said bill authorizing the court to grant the relief sought, or any other relief."

The Circuit Court, without considering the first and third causes of demurrer, sustained the demurrer for the second cause assigned, and dismissed the bill. 15 Fed. Rep. 753. The plaintiff appealed to this court, and having since died, the appeal was prosecuted by his executors.

*Mr. William Reinecke* and *Mr. George Hoadly* for appellants. *Mr. Herman Marckworth* was with them on the brief.

*Mr. George Shiras, Jr.,* for appellees. *Mr. C. S. Fetterman* was with him on the brief.

MR. JUSTICE GRAY delivered the opinion of the court.

This bill was filed against the trustees of the Harmony Society, an unincorporated association of persons living together as a community, by a former member of the society, claiming a share in property in the hands of the trustees.

The bill is sought to be maintained on the ground that the trust was not a charity, in the legal sense, and the members of the society were equitable tenants in common of the property held in trust. The learned counsel for the appellants differ in their views of the trust; the one insisting that it was unlawful because founded in fraud and against public policy, and should therefore be dissolved; and the other contending that it was a lawful and continuing trust. We have not found it necessary to consider which of these is the sound view, because we are of opinion that the plaintiff did not show himself to be entitled to invoke the interposition of a court of equity.

As a general rule, doubtless, length of time is no bar to a trust clearly established, and express trusts are not within the statute of limitations, because the possession of the trustee is presumed to be the possession of his cestui que trust. *Prévots* v. *Gratz*, 6 Wheat. 481, 497; *Lewis* v. *Hawkins*, 23 Wall. 119, 126; *Railroad Co.* v. *Durant*, 95 U. S. 576.

But this rule is, in accordance with the reason on which it is founded, and as has been clearly pointed out by Chancellor Kent and Mr. Justice Story, subject to this qualification, that time begins to run against a trust as soon as it is openly disavowed by the trustee, insisting upon an adverse right and interest which is clearly and unequivocally made known to the cestui que trust; as when, for instance, such transactions take place between the trustee and the cestui que trust as would in case of tenants in common amount to an ouster of one of them by the other. *Kane* v. *Bloodgood*, 7 Johns. Ch. 90, 124 (*S. C.* 11 Am. Dec. 417); *Robinson* v. *Hook*, 4 Mason, 139, 152; *Baker* v. *Whiting*, 3 Sumner, 475, 486; *Oliver* v. *Piat*, 3 How. 333, 411. This qualification has been often recognized in the opinions of this court, and distinctly affirmed by its latest judgment upon the subject. *Willison* v. *Watkins*, 3 Pet. 43, 52; *Boone* v. *Chiles*, 10 Pet. 177, 223; *Seymour* v. *Freer*, 8 Wall. 202, 218; *Bacon* v. *Rives*, 106 U. S. 99, 107; *Phillippi* v. *Phillipe*, 115 U. S. 151.

In the case of an implied or constructive trust, unless there has been a fraudulent concealment of the cause of action, lapse of time is as complete a bar in equity as at law. *Hovenden* v. *Annesley*, 2 Sch. & Lef. 607, 634; *Beckford* v. *Wade*, 17 Ves. 87. In such a case, Chief Justice Marshall repeated and approved the statement of Sir Thomas Plumer, M. R., in a most important case in which his decision was affirmed by the House of Lords, that "both on principle and authority, the laches and non-claim of the rightful owner of an equitable estate, for a period of twenty years, (supposing it the case of one who must within that period have made his claim in a court of law, had it been a legal estate,) under no disability, and where there has been no fraud, will constitute a bar to equitable relief, by analogy to the statute of limitations, if,

during all that period, the possession has been under a claim unequivocally adverse, and without anything having been done or said, directly or indirectly, to recognize the title of such rightful owner by the adverse possessor." *Elmendorf* v. *Taylor*, 10 Wheat. 152, 174; *Cholmondeley* v. *Clinton*, 2 Jac. & Walk. 1, 175, and 4 Bligh, 1.

Independently of any statute of limitations, courts of equity uniformly decline to assist a person who has slept upon his rights and shows no excuse for his laches in asserting them. "A court of equity," said Lord Camden, "has always refused its aid to stale demands, where the party slept upon his rights, and acquiesced for a great length of time. Nothing can call forth this court into activity, but conscience, good faith and reasonable diligence; where these are wanting, the court is passive, and does nothing. Laches and neglect are always discountenanced, and therefore, from the beginning of this jurisdiction, there was always a limitation to suits in this court." *Smith* v. *Clay*, 3 Bro. Ch. 640, note. This doctrine has been repeatedly recognized and acted on here. *Piatt* v. *Vattier*, 9 Pet. 405; *McKnight* v. *Taylor*, 1 How. 161; *Bowman* v. *Wathen*, 1 How. 189; *Wagner* v. *Baird*, 7 How. 234; *Badger* v. *Badger*, 2 Wall. 87; *Hume* v. *Beale*, 17 Wall. 336; *Marsh* v. *Whitmore*, 21 Wall. 178; *Sullivan* v. *Portland & Kennebec Railroad*, 94 U. S. 906; *Godden* v. *Kimmel*, 99 U. S. 201. In *Hume* v. *Beale*, the court, in dismissing, because of unexplained delay in suing, a bill by cestuis que trust against a trustee under a deed, observed that it was not important to determine whether he was the trustee of a mere dry legal estate or whether his duties and responsibilities extended further. 17 Wall. 348. See also *Bright* v. *Legerton*, 29 Beavan, 60, and 2 D., F. & J. 606.

When the bill shows upon its face that the plaintiff, by reason of lapse of time and of his own laches, is not entitled to relief, the objection may be taken by demurrer. *Maxwell* v. *Kennedy*, 8 How. 210; *National Bank* v. *Carpenter*, 101 U. S. 567; *Lansdale* v. *Smith*, 106 U. S. 391.

The allegations of this bill, so far as they are material to the defence of laches, are in substance as follows:

The Harmony Society is a voluntary association, formed in 1805 by the plaintiff's parents and other heads of families, who had emigrated from Germany under the leadership of one Rapp, and become subject to his control in both spiritual and temporal affairs. In that year Rapp, for the purpose of acquiring absolute dominion over their means and mode of living, falsely and fraudulently represented to them that they could not be saved from eternal damnation, except by renouncing the plan of a separate home for each family, yielding up all their possessions, as had been done by the early Christians, and laying them at the feet of Rapp as their apostle, to be put into a common fund of the society, and thenceforth living as a community under his control, receiving in return only the necessaries of. life; and they, induced by and relying on his false and fraudulent representations, immediately yielded up all their possessions to the common fund of the society, and placed the fund in his keeping as their trustee, and thenceforth lived as a community or common household, submitted themselves and their families to do for the community such work as he directed, allowed the avails thereof to form part of the common fund, and relinquished to him and his successors in the leadership of the community the management of the trust fund and the control of their own persons and those of their wives and children, and received only the necessaries of life in return. Rapp received and accepted the trust fund, and all the accretions to it by the work of the inhabitants of the community or otherwise, not as his own, but in trust for the members of those families and the contributors to the fund, and for their common benefit; and always, up to his death in 1847, recognized and acknowledged said trust, and disclaimed any greater interest in the fund than that of any other contributor, and any other right to its management and control than by virtue of his leadership of the community. In 1807 Rapp obliged his followers to abjure matrimony, and thenceforth did not permit them to marry in the community, and compelled any one about to marry to leave it. The plaintiff was born in the community in 1807, and was reared in and as a part of it, under Rapp's teachings and control, and faith-

fully worked for it from the age of twelve to the age of twenty-four years, and allowed the avails of his work to become part of the common fund, and received in return nothing but the necessaries of life, which were of far less value than the avails of his work; and in 1831, being about to marry, had to leave and did leave the community. The trust fund so received and accepted by Rapp, with its profits, interest and accretions, now amounts to eight millions of dollars, and yields an annual income of two hundred thousand dollars, and is held by the defendants on the same trust on which Rapp held it in his lifetime; and neither Rapp nor the defendants ever rendered any account to the plaintiff or to the beneficiaries of the fund, although the plaintiff, before bringing this suit in May, 1882, demanded of the defendants an account and a settlement of his share.

The trust on which Rapp, and the defendants as his successors, held the common fund of the Harmony Society, is described in one place in the bill as "for the members of said families and the contributors of said fund and for their common benefit," that is to say, as is clearly explained by what goes before, in trust for their common benefit as a community, living together in the community, working for the community, subject to the regulations of the community, and supported by the community. This was the "said trust," which, as the bill afterwards alleges, Rapp, up to his death, and his successors, until the bringing of this suit, "always recognized and acknowledged." The constant avowal of the trustees that they held the trust fund upon such a trust is wholly inconsistent with and adverse to the claim of the plaintiff that they held the fund in trust for the benefit of the same persons as individuals, though withdrawn from the community, living by themselves, and taking no part in its work.

The plaintiff, upon his own showing, withdrew from the community in 1831, and never returned to it, and, for more than fifty years, took no step to demand an account of the trustees, or to follow up the rights which he claimed in this bill.

If he ever had any rights, he could not assert them after

such a delay; not on the ground of an express and lawful trust, because the express trust stated in the bill, and constantly avowed by the trustees during this long period, was wholly inconsistent with any trust which would sustain his claim; not on the ground that the express trust stated in the bill was unlawful and void, and therefore the trustees held the trust fund for the benefit of, all the contributors in proportion to the amounts of their contributions, because that would be an implied or resulting trust, and barred by lapse of time. In any aspect o' the case, therefore, if it was not strictly within the statute of limitations, yet the plaintiff showed so little vigilance and so great laches, that the Circuit Court rightly held that he was not entitled to relief in equity.

It is proper to add that this decision does not rest in any degree upon the judgments of the Supreme Court of Pennsylvania and of this court, in the cases cited at the bar, in favor of the trustees of the Harmony Society in suits brought against them by other members, because each of those cases differed in its facts, and especially in showing that the society had written articles of association, which are not disclosed by this bill. *Schriber* v. *Rapp*, 5 Watts, 351 (*S. C.* 30 Am. Dec. 327); *Baker* v. *Nachtrieb*, 19 How. 126.

*Decree affirmed.*