PERALTA et al. v. STATE OF CALIFORNIA et al.

(Circuit Court of Appeals, Ninth Circuit. October 3, 1910.)

No. 1,837.

1. PUBLIC LANDS (§ 213*)—SPANISH GRANT—FRAUDULENT DESCRIPTION IN PATENT—SUIT FOR RELIEF—EVIDENCE.

In a suit to recover lands, based on an alleged conspiracy, resulting in the insertion of false and fraudulent descriptions in patents for a Spanish land grant, issued pursuant to judgments of the United States courts sustaining the grant, which judgments admittedly contained a correct description of its boundaries, acts of the conspirators prior to such judgments in secreting or destroying title papers and maps, which, as evidenced by the judgments, availed them nothing, do not afford ground for relief, and are available to complainants only as matter of inducement, in the way of setting forth the crucial charge of procuring the insertion of false descriptions in the patents.

[Ed. Note.—For other cases, see Public Lands, Dec. Dig. § 213.*]

2. PUBLIC LANDS (§ 222*)—SPANISH GRANT—SUIT TO REFORM BOUNDARIES—LACHES.

A Spanish land grant in California, made in 1820, was confirmed by the Mexican governor in 1844, and its validity was finally established by the judgment of the Supreme Court of the United States in 1856, affirming the decision of the District Court. The records of the United States courts contained correct descriptions and maps of the grant. Pursuant to such judgments, patents issued to the heirs of the grantee, the last in 1877. Thirty years later the patentees brought suit, alleging that, through a conspiracy, false and fraudulent surveys were made and inserted in the patents, by which they were deprived of portions of the original grant, which they sought to recover. Such lands had in the meantime been acquired by others and had become valuable. The evidence further showed that complainants had knowledge, before the issuance of the patents, of the alleged fraudulent surveys, of the mutilation of the recorded map of the original survey, and of the abstraction and concealment of title papers, alleged to have been the work of the conspirators. *Held* that, on receipt of the patents, they were charged with notice of the incorrectness of the descriptions, and, whether or not they had knowledge of the fraud, they knew facts which put them on inquiry, and that, under all the evidence, they were chargeable with laches, which defeated their right to recover.

[Ed. Note.—For other cases, see Public Lands, Dec. Dig. § 222.*]

Appeal from the Circuit Court of the United States for the Northern District of California.

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Suit in equity by Antonio Maria Peralta and others against the State of California and others. Decree for defendants, and complainants appeal. Affirmed.

J. W. Henderson, E. E. Gehring, and J. L. Kennedy, for appellants. Horace G. Platt, Richard Bayne, Charles E. Wilson, T. A. Perkins, Hartley F. Peart, A. F. Morrison, W. I. Brobeck, John M. Lewis, Charles W. Slack, Milton J. Green, Gaillard Stoney, Orville C. Pratt, Jr., Frank Shay, Thos. S. Molloy, Fitzgerald & Abbott, E. M. Gibson, James A. Johnson, Johnson & Shaw, John W. Stetson, William H. O'Brien, Edward W. Engs, Harmon Bell, and Welles Whitmore, for appellees.

Before GILBERT and ROSS, Circuit Judges, and WOLVERTON, District Judge.

WOLVERTON, District Judge. This is a suit to quiet title to certain lands described and designated as "lands of which the Peraltas have been deprived." A more definite description cannot be had of the lands involved, except by a comparison of the true description of the San Antonio Rancho with what is alleged to be a faulty or fraudulent one contained in the patents issued by the United States to the Peralta heirs, if it be that such latter description is faulty. The San Antonio Rancho is a grant made by Don Pablo Vicente De Sola, Governor of Alta California, June 20, 1820, the land comprised thereby lying and being in the counties of Alameda and Contra Costa and the city and county of San Francisco, the boundaries of which are set out in the bill of complaint filed herein. This grant was later, to wit, in the year 1844, confirmed by Manuel Micheltorena, the then Governor of Alta California. In 1845 Luis Peralta conveyed to Joaquin Moraga and Juan Bernal a portion of the tract comprised by the grant, particularly described. Later, the date of which not appearing, Luis Peralta by will partitioned the remaining portion of the grant among his four sons, Ygnacio, Antonio Maria, Vicente, and Domingo Peralta. In 1852 the four sons petitioned the United States Board of Commissioners on Private Land Claims in California for a determination respecting the validity and extent of the San Antonio grant, and, upon proofs adduced, the grant was declared valid throughout the entire boundaries as claimed. The findings of the commissioners were later confirmed by the United States District Court in and for the Southern District of California. The decree of the District Court was still later affirmed on appeal to the Supreme Court of the United States. See United States v. Peralta et al., 19 How. 343, 15 L. Ed. 678. The date of the findings and decree of the court is not given in the bill; but, on reference to the decision in the Supreme Court, it is found to have been rendered in 1856. On January 30, 1865, the four sons constituted one Ad. Steele, by instrument in writing, their attorney in fact, with authority to search for the missing title papers of the San Antonio grant, and, for a valuable consideration, bargained and sold to Steele four-fifths of the lands of said grant of which they (the Peraltas) by fraud or otherwise had been deprived, with power to compromise, sell, or dispose of any part thereof by paying to the

Peraltas one-fifth of the net profits secured from said sales or compromises. The agreement further recites, in effect, that said title papers were, on August 10, 1854, handed by Domingo Peralta to H. W. Carpentier, who was appointed attorney by the former to present before the land commissioners of the United States the said papers, and thereby to obtain the approval of the grant; that said papers were not so presented, thus causing an adverse decision; that the original grant was filed in evidence on appeal from the decision of the commissioners to the District Court of the United States, and there taken from the records and lost; and that the lands affected by the instrument of writing comprised the entire grant, except such as had theretofore been conveyed to Moraga and Bernal, and three other tracts specifically described. On January 17, 1908, Steele assigned and set over to William Muir all his right, title, and interest in and to said instrument, in consideration of certain covenants and stipulations made and entered into on the part of Muir. These facts all appear by the bill of complaint except as indicated.

The bill further asserts that there was issued by Governor De Sola, and filed with the keeper of public records at Monterey, Cal., documentary evidence of the title to said grant, including an accurate map thereof, and also a duly certified copy of said map, designated as "Title Paper No. 1" and "Title Paper No. 2," respectively; that in the year 1849 a duly certified copy of Title Paper No. 1, which is designated as "Title Paper No. 3," was delivered to Luis Peralta; that in the year 1844, upon presentation of Title Paper No. 2, Governor Manuel Micheltorena confirmed the grant, and issued an order as evidence thereof, which is designated as "Title Paper No. 4," and which contained upon the last page a correct copy of the map of the grant and the signature of the Governor, and was placed on file with the alcalde, the keeper of public records at Monterey; that a certified copy of Title Paper No. 1, designated as "Title Paper No. 5," was made and deposited with the prefect of the district of San Joaquin, afterwards known as Contra Costa; that a certified copy of Title Paper No. 1 was made by Samuel D. King, Surveyor General of the United States for California, on June 20, 1851, and delivered to W. W. Chipman, which was afterwards, in 1868, delivered by Chipman to William Muir, one of the complainants, who has since retained possession of it. This is designated as "Title Paper No. 6."

It is then further alleged, upon information and belief, that in the year 1848, during the gold excitement in California, a number of immigrants, including Horace W. Carpentier, Elam Brown, and John C. Fremont, entered into a conspiracy, known and designated as the "Squatters' League," for depriving the complainants of large parts of said San Antonio Rancho and adjoining ranches; that in pursuance of such conspiracy the parties thereto did make and procure to be made false and fraudulent surveys of the boundaries of said San Antonio Rancho and of the ranchos bordering thereon, and did mutilate, conceal, and destroy the evidence of title to all of said ranchos; that said Horace W. Carpentier was in the employ of the Peraltas at the time he was participating with said "Squatters' League," and misled and deceived them while pretending to be acting in their behalf and for

their best interests; that about the year 1850 Title Paper No. 1 was removed from the office of the keeper of the archives at Monterey, Cal., and placed beyond the reach of the complainants; that in the year 1858 Title Paper No. 2 was likewise removed from the court files of the District Court of the United States, and concealed from complainants; that about October 21, 1868, Title Paper No. 3 was removed from the county clerk's office at San Leandro, Cal., where it was left by William Muir to be filed for record, and was also concealed from complainants; that in about the year 1858 Title Paper No. 4 was in the office of the Secretary of State at Sacramento, Cal., and that at about said time the said conspirators tore off, removed, and destroyed a portion of the last page thereof, containing the signatures of Governors De Sola and Micheltorena, and the southwesterly and northwesterly portions of the said map, which title paper in its mutilated condition is now in the office of the United States Surveyor General for California, and a purported copy thereof is on file in the office of the clerk of the District Court of the United States for the Northern District of California; that about the year 1858 said Title Paper No. 5 was removed from the office of the prefect of the district of San Joaquin, afterwards known as Contra Costa, and likewise concealed from complainants; and as to all these title papers, from 1 to 5 inclusive, that the conspirators removed and mutilated them for the purpose of defrauding the complainants of portions of their lands; that in the years 1852 and 1853 C. C. Tracy, a deputy under Samuel D. King, United States Surveyor General for California, made surveys of the San Antonio and adjoining ranchos, and returned the notes of the same to the office of the Surveyor General, but that these notes were in the latter year suppressed and concealed by the conspirators; that in the year 1857 Horace A. Higley, deputy under John C. Hays, then United States Surveyor General of California, knowingly and willfully made a false and fraudulent survey of that portion of the San Antonio Rancho decreed to Ygnacio Peralta by the United States District Court, he, the said Higley, being one of the conspirators; that thereafter the said conspirators caused and procured said false and fraudulent survey to be inserted in the patent issued by the United States to Ygnacio Peralta, and thereupon seized possession of the "lands of which the Peraltas have been deprived," and they and their successors and assignees have been in possession ever since, to the exclusion of complainants; that in the month of May, 1874, James C. Stratton, United States Surveyor General for California, made a false survey of the part of said San Antonio Rancho decreed to Antonio Maria Peralta, and thereupon seized possession of such lands of which the Peraltas have been deprived, and they and their successors still hold possession as against complainants.

It is further averred that in 1858 the predecessors in interest of the Peralta heirs made a demand upon Horace A. Higley, the Surveyor General of California, for a correct survey of the San Antonio Rancho in accordance with the decree of the United States District Court; that thereupon Higley, in further pursuance of the conspiracy, caused his deputy, James T. Stratton, to make a correct survey, but that the conspirators assured the predecessors in interest of complainants that

they would receive their grant to its full extent, and said predecessors of complainants believed and relied upon such assurances; that the conspirators, having so misled and deceived such predecessors, failed to return and file said correct survey in the proper office, but, on the contrary, filed in such office a false and fraudulent survey, certified to by the Surveyor General of California as a true and correct official plat and survey of the said San Antonio Rancho, which said false and fraudulent survey was afterwards procured to be inserted in the patents issued by the United States to the said four sons of Luis Peralta, and particularly in that certain patent issued to Domingo and Vicente Peralta, which last patent was issued in February, 1877.

It is further alleged that request has been made of the Surveyor General of the United States for California and the Surveyor General of California, from time to time, reaching back to 1853 and running to the present incumbents, for a correct survey and return of the San Antonio Rancho, in accordance with the decrees of the District and Supreme Courts of the United States, but that each and all of such officers have failed and refused to comply therewith. It is further shown what efforts have been made by the Peraltas, and what has been done by the officers of the Mexican and United States governments in furtherance and protection of the complainants' rights in said rancho, following which it is alleged that, after having their title established by the decisions of the District and Supreme Courts of the United States, the complainants and the Peralta heirs caused numerous suits to be brought for the purpose of protecting and maintaining their rights, but that in all of said suits they failed to establish their just claims because of the unfaithfulness of Horace W. Carpentier, who was all the time acting in pursuance of said conspiracy. Then follows this allegation, by paragraph XXI of the bill:

"That said William Muir in the year 1858, with a view to investing in real estate in Contra Costa and Alameda counties, made inquiries as to the title to Spanish and Mexican land grants, including said San Antonio Rancho, and then learned that the title to said San Antonio Rancho had been tampered with; that in the year 1907 said William Muir investigated the titles to certain property on both sides of the bay of San Francisco, with a view to securing the approaches for a tunnel under said bay, connecting San Francisco and Oakland, and he then discovered for the first time that the said Title Paper No. 4 had been torn and mutilated; that thereupon the said William Muir made a careful search of the title to said San Antonio Rancho, and thereafter and subsequent to the month of September, 1907, notified the other complainants of the facts so found by him; that none of these complainants, except the said William Muir, or any of the Peralta heirs, defendants herein, knew or had any means of knowing, prior to the month of September, A. D. 1907, of the aforesaid acts, or any of them, constituting the fraud as herein set forth, or of the existence of said Title Paper No. 6; that said William Muir had no right, title, estate, interest, or claim in or to the said San Antonio Rancho, or any part thereof, prior to the month of January, A. D. 1908; and that your orators are informed and believe, and therefore allege, that none of the predecessors in interest of these complainants or the Peralta heirs, defendants herein, ever knew or had any means of knowing of the aforesaid acts, or any of them, constituting the fraud as herein set forth, or of the existence of said Title Paper No. 6."

This is followed by other allegations, more formal in character. The prayer is, first, for an order requiring the Surveyor General of

the United States for California and the Surveyor General of California to make a correct survey of said rancho in accordance with the original grant; second, that the defendants be required to set forth their respective claims of title; third, that all of such claims of title be declared null and void; fourth, that complainants' claims be adjudicated and settled; and, fifth, for such other and further relief as to the court may seem meet.

Demurrers have been interposed to the bill by numerous of the defendants, which are based in the main upon three grounds, namely: That the court is without jurisdiction; that there is no equity in the bill; and that the complainants have been guilty of laches barring their recovery. Whatever may be the merits as it pertains to the first two grounds assigned, we have concluded that the cause must be disposed of upon the last, and will therefore discuss that one only.

If the complainants are entitled to any relief, of necessity under the bill it must depend upon the alleged substitution and insertion in the patents issued to the sons of Luis Peralta of an incorrect and false survey of the lands and premises comprised by the San Antonio Rancho grant for the admittedly correct description ascertained and determined by the commissioners of the United States for ascertaining and settling private land claims in California, and the findings and adjudications of the District and Supreme Courts of the United States. The fraud, if any was committed for which relief can be granted, must rest here, and nowhere else. The alleged frauds committed antedating these findings and adjudications, as to which the inquiry was begun in 1852 and terminated by the decision of the Supreme Court of the United States in 1856, can avail the complainants but little, and can serve only as matter of inducement in the way of setting forth the crucial charge, which is that an incorrect and fraudulent survey of the grant was willfully caused to be inserted in the patents subsequently issued. There were three of these patents—one issued to Antonio Maria, one to Ygnacio, and one to Domingo and Vicente. The dates at which the two former were issued are not given, but we are advised that the date of the latter is February 10, 1877.

Why do we say that such allegations of fraud can operate only as inducement in the way of setting forth the crucial charge? It is because whatever attempt was theretofore made to defraud the Peraltas did not avail the conspirators anything. The commissioners and the District and Supreme Courts of the United States, notwithstanding any such attempt, duly ascertained and determined the rightful and proper description and boundaries of the grant, and the courts set forth the same in their findings and decisions. The correct description, therefore, became a matter of permanent record at that time, and has so continued ever since, accessible to the public and to all persons concerned. This is conceded. All previous fraud, therefore, did the complainants no harm, because the commissioners and the courts gave them all they claimed and all they were entitled to.

The conspiracy, of which much is recounted in the bill, and which became known as the "Squatters' League," is said to have originated in 1848, the time of the gold excitement in California, and to have continued uninterruptedly in its operations and malfeasance down to the

issuance of the last of these patents, a period of nearly 30 years. It was in 1858, 10 years after the formation of such league, that Higley made the fraudulent survey, which it is alleged was caused to be written into the Ygnacio Peralta patent, and it was in 1874, 26 years thereafter, that Stratton is said to have made the fraudulent survey that found its way into the Antonio Maria Peralta patent. When the alleged false survey was made which was incorporated in the patent to Domingo and Vicente Peralta, issued in 1877, does not appear. We must assume that these patents, when issued, came into the possession of the patentees, who must therefore have become aware of the nature of the description contained therein as it respects the lands granted. This was tantamount to notice to them, and knowledge on their part, of any discrepancy between such descriptions and the true description of the San Antonio grant as ascertained and determined by the commissioners and the United States courts. From that time on they were chargeable with notice of any such defect, if it existed. How, if at all, the incorrect descriptions were inserted, they may not have known; but the fact of the discrepancy would be apparent, if it existed, and they are legally chargeable with knowledge of it.

We may now give attention to some further details, and ascertain, if possible, whether the complainants are chargeable with knowledge or notice of the alleged fraud. The instrument of writing bearing date January 30, 1865, nine years subsequent to the time of the decision by the Supreme Court settling the grant, whereby Steele is authorized to search for missing title papers, discloses the alleged fact that Carpentier, one of the alleged conspirators, and, as appears by the bill, chief of them, had proven untrue to his trust by withholding such title papers from the commissioners, and thus causing, as appears from the writing, an adverse decision; and it is further recited that these papers were lost. A fact of some significance is that this instrument purports to convey to Steele four-fifths of the lands of which the Peraltas have been deprived—certainly a very large proportion for his services in securing title to and disposing of the lands; either this, or the title must have been considered shadowy and of uncertain character. Muir takes his title under this instrument, and, of course, takes it cum onere, with notice of all facts which it serves to impart. Much of the fraud charged relates to the taking of certain title papers from their several places of deposit, and concealing them, whereby they were lost to the complainants, and in one case, referring to Title Paper No. 4, it is charged that the conspirators mutilated it by tearing off the signatures and destroying a portion of the accompanying map of the lands. All these title papers are copies of originals, namely, Title Paper No. 1, which evidenced the original grant by Governor De Sola, and Title Paper No. 4, being a confirmation by Governor Micheltorena of the original grant.

As to these title papers, it is alleged that No. 1 was removed from its regular place of deposit in the year 1850, which was prior to the final confirmation of the grant by the United States Supreme Court in 1856; that No. 2 was removed from the court files of the United States District Court and concealed in 1858, and that in 1868 No. 3 was removed from the county clerk's office in San Leandro, where it

had been left by Muir to be filed for record; that No. 4 was torn and mutilated in 1858. This mutilation must have been done much earlier, however, as it is elsewhere alleged that Carpentier produced the paper in its mutilated condition before the United States commissioners, and that it was pointed out by the sons that such paper did not correctly define the boundaries of the San Antonio Rancho, and they produced living witnesses who testified before the board respecting the known boundaries as in the bill of complaint set forth. Proceedings, as previously stated, were instituted before the board for settlement of such boundaries in 1852, and were terminated in 1856. So, therefore, this mutilated instrument was in evidence before the commissioners. It is now in the office of the United States Surveyor General for California in San Francisco. Title Paper No. 5 was removed from its place of deposit in 1858, and No. 6 is now in the hands of Muir, and has been since 1868.

Just how the complainants have been in the least delayed or hampered by the loss of these papers is not apparent. The title to the rancho was declared and confirmed by the United States courts, and the correct description of the grant was there recorded, and these papers could prove nothing beyond what had been adjudicated and confirmed. The evidence of mutilation of Title Paper No. 4, however, was a thing of which the Peraltas had absolute knowledge, and whatever fraud attended its production by Carpentier must have come within their notice, as they say they offered evidence to counteract his acts, and thereby to establish the correct boundaries. It should be remarked, however, that Title Paper No. 4, which evidenced the confirmatory grant by Micheltorena, has been a public record, and accessible, ever since its issuance in 1844. So that with this and the confirmed grant by the United States courts, it is hardly possible that there was any lack of evidence by which to protect the complainants' rights in the grant, whatever they may be. The fraud, therefore, alleged in relation to these missing papers, affords no plausible grounds for relief whatever, and, even if unknown to the complainants, the fact could be of no assistance to them here. That the complainants had knowledge that the title papers were lost is admitted, but it is now that the loss is attributed to a conspiracy of long standing to defraud them. But if the fact of the loss of such papers is not now material to complainants' recovery, the further fact that they were not aware of the fraud attending the loss could not aid them, because only an incident to the main, the controlling, fact. All this matter may yet be treated as set forth by way of inducement to the pivotal contention that a fraudulent survey and description was written into the patents, which fraud, it is alleged, was unknown to the complainants.

We are advised that the first fraudulent survey was made in the month of May, 1857, by Horace A. Higley, a deputy under John C. Hays, then United States Surveyor General for California, and that the next was made in 1874, by James C. Stratton, then United States Surveyor General for California, and that these surveys were surreptitiously caused to be inserted in the patents subsequently issued. In the same connection, it is alleged that the Peralta heirs in 1858

demanded of Higley that he make a correct survey of the grant in accordance with the decree of the United States District Court, which was done, but that, for the purpose of quieting the fears of such heirs, the conspirators assured them that they would receive their grant to the full extent of its boundaries, and that, relying upon such conspirators, they were deceived, and that such conspirators, which is set forth upon information and belief, substituted the fraudulent for the correct survey, and filed the same in the office of the Surveyor General. All this shows at least a suspicion upon the part of the heirs that a fraud was being or was liable to be perpetrated; for why should they demand of a public officer that he make a correct survey, which he was in duty bound to do under his oath? It should be borne in mind that it is charged that these public officers were members of the conspiracy and participating therein. It is further set forth that ever since the fraudulent survey of 1857 the United States Surveyor General has neglected and refused to make and return a correct survey, although many times requested so to do from that day to the commencement of this suit, and that such requests have likewise been made of the Surveyor General of the state of California. This indicates that the complainants were watchful of what was being done. Further than this, the heirs, in 1894, petitioned the President of the United States for relief, and in 1897 applied to the Legislature of the state of California, and continued so to do at every session thereafter, to and including that of 1903. In 1885 the widow of Domingo Peralta, through probate, endeavored to establish the true boundaries of the grant, but was strenuously opposed. Subsequent to the establishment of the grant by the United States courts, many suits have been instituted by the Peralta heirs, said to be 60 in number, for the purpose of protecting and maintaining their rights in and to the grant. In many of these suits it is alleged that Horace W. Carpentier, who represented them as their attorney, betrayed them, proving false to his trust, and that, by reason thereof, their attempts to establish their rights proved abortive, and this in pursuance of the alleged conspiracy.

Now, in view of the fact that the descriptions in the patents disagreed with the description in the decree of the United States courts establishing the grant, of which the complainants are chargeable with knowledge, of the further fact of the mutilation of Title Paper No. 4 and a knowledge thereof by the heirs of Luis Peralta, of the further fact that demand was made of the United States Surveyor General for a correct survey of the boundaries of the grant, of the further fact that constant application and request were being made for a corrected survey, and that the President of the United States and the Legislature of the state of California were memorialized for a recognition of their rights, and that many cases have been brought in the courts to establish them, it must be held that the complainants were possessed many years ago of at least knowledge sufficient to put them upon inquiry as to the fact of the existence of the alleged conspiracy, and the further fact of the fraudulent introduction of an incorrect survey into the patents. Many facts about the conspiracy, and of its designs and purposes and operation, are alleged in great detail and circumstantially, and it seems impossible for all the things recounted as to the

workings of the conspiracy to have happened without the Peralta heirs, ever watchful of their interests, having gained some definite knowledge of the fraud being perpetrated against them. Indeed, the bill protests too much to warrant any one in believing that the heirs were without knowledge of the alleged fraud affecting their interests.

This leaves out any discussion as to Muir's knowledge, who is the party having by far the larger interest in the controversy. He has been in possession of one of the title papers for upwards of 30 years, and has had more or less concern with the grant in the meantime. He ascertained as early as 1858 that the title to said rancho had been tampered with; but it is alleged that he made no investigation of the title until in 1907, when he discovered for the first time that Title Paper No. 4 had been mutilated, and thereupon continued his search, and notified the complainants of the facts found by him, who and their predecessors, it is alleged, had no previous knowledge thereof. This is largely the allegation of a conclusion that the complainants were without knowledge of the fraud. But, however that may be, the preceding allegations of the bill are sufficient from which it may reasonably be deduced that they have been long in possession of ample facts of such character as to put them upon inquiry as to the essential fact of fraud in the insertion of a false description in the patents, and they are therefore chargeable with such knowledge.

Now, more than 30 years have elapsed since the last of these patents issued, and the lands supposed to be involved in the controversy have become populous, and have increased in value from a few thousand to many millions of dollars, and many persons have become interested therein as owners, as shown by the numerous parties defendant. Under such conditions, coupled with the knowledge, or at least the means of knowledge, possessed by the complainants for tracing up and ascertaining the pivotal fraud complained of, it must be held that they are guilty of laches in not sooner instituting their suit for settling in their behalf the title to the disputed lands. While the law should and does afford rules and regulations for instituting, maintaining, and carrying on litigation, that the ends of justice may be secured, yet it is the wholesome policy of the law that there should be an end of litigation, and hence it is that stale demands are not favored in equity. This conclusion is supported by the following authorities: National Bank v. Carpenter, 101 U. S. 567, 25 L. Ed. 815; Speidel v. Henrici, 120 U. S. 377, 7 Sup. Ct. 610, 30 L. Ed. 718; Galliher v. Cadwell, 145 U. S. 368, 12 Sup. Ct. 873, 36 L. Ed. 738; Townsend v. Vanderwerker, 160 U. S. 171, 16 Sup. Ct. 258, 40 L. Ed. 383; O'Brien v. Wheelock, 134 U. S. 450, 22 Sup. Ct. 354, 46 L. Ed. 636.

The decree of the Circuit Court will be affirmed.