## McCALLUM v. ANDERSON et al.

### No. 2934.

Circuit Court of Appeals, Tenth Circuit.

Jan. 10, 1945.

812

Earl Pruet, of Oklahoma City, Okl., for appellant.

Earl Q. Gray and John M. Poindexter, both of Ardmore, Okl., for appellees.

Before PHILLIPS, HUXMAN and MURRAH, Circuit Judges.

MURRAH, Circuit Judge.

The appellant, Effie Anderson, now McCallum, prosecutes this appeal from a judgment of the trial court denying recovery in a suit against Nettie Anderson as the widow; Hoxie Anderson as the surviving son of C. L. Anderson; and Hoxie Anderson as the executor of the estate of Charles Anderson, a deceased son of C. L. Anderson. The suit seeks to recover $76,-317.35 as principal and interest alleged to be owing her from a trust fund created by the will of her father, J. F. Anderson, in which her share of his estate was conveyed to her brother, C. L. Anderson, in trust for her use and benefit.

Jurisdiction is based upon agreed diversity of citizenship and requisite amount in controversy. The complaint alleges breaches of the trust obligation, and in addition to the recovery of the trust fund prays for $50,000 damages for the alleged breaches. The appellees are sought to be held liable on the theory that the trust funds sought to be recovered descended to them as heirs of the estate of the trustee, subject to the equitable lien of the appellant as beneficiary of the trust.

In 1909, J. F. Anderson died leaving a will by the terms of which, subject to enumerated legacies, he bequeathed his entire estate in equal parts to his children or their issue. However, the appellant's share was conveyed to her brother, C. L. Anderson, in trust for her use and benefit, with full power to sell, manage, and control the same during her lifetime. He was specifically authorized to invest the estate in such property and securities as would in his judgment safely yield a reasonable "rent and revenue", and to pay the same or so much thereof to the beneficiary as might be necessary for her support and maintenance; provided however if in his judgment the rents and revenue derived from the trust were insufficient for her support and maintenance, the trustee was authorized to use such portions of the principal as in the exercise of his discretion was necessary for the beneficiary's economical support and maintenance during her lifetime, even if it were necsesary to use all of the said trust estate.

Subsequent to the execution of the will, certain properties were conveyed to C. L. Anderson for the use and benefit of the appellant, and by a codicil to his will, the testator provided that all the notes, accounts, and monies which may have theretofore or thereafter been conveyed to C. L. Anderson in trust for the appellant, should be "managed, controlled, used and finally disposed of" in accordance with and as specifically directed in the body of the will.

On March 17, 1910, the trustee rendered to appellant a statement of the assets he had received from the estate of his father as trustee for her use and benefit. Specifically he acknowledged having received $5,000 from his father before his death, and $8,829.37 from the estate since his death. He detailed the manner in which the assets had been invested in the form of loans, the parties to whom the loans had

been made, the amount of each, which, with accrued interest thereon, amounted to a total of $14,473.35. The appellant was informed that this statement reflected all of the assets he had received, and exactly where and how they were invested; that it would be a "great pleasure" to furnish any other information concerning the matter; that he wished he did not have the responsibility, but under the terms of his father's will, he was forced to accept and handle it to the very best of his ability; and that he would do his best to handle her affairs with more caution than he would his own. In January, 1911, the appellant was advised that the balance of the trust fund was $13,929.57, and on January 11, 1912, that he held notes and cash amounting to exactly $14,000, after having disbursed $1,380.94 to the beneficiary during the year 1911.

According to the record, after December 28, 1915, the trust fund was evidenced by an entry upon the books and records of the trustee, by which he charged himself with $14,000, and credited the beneficiary with the same amount. In other words, by this book entry, the trustee acknowledged his indebtedness to the beneficiary in the amount of $14,000, and the trust fund thereupon became commingled with the general assets of the trustee, and was never thereafter identified as a separate and distinct trust fund, except as an entry upon his books. From time to time, the appellant was informed of the credits to the trust fund from interest on the investments, the disbursements to her, and the balance after such debits and credits. The correspondence between the trustee and the beneficiary in the years 1916, 1918 and 1919, show conclusively that the trust fund remained at $14,000, and that it yielded 7 per cent interest annually during this period. In 1928, the trustee informed the beneficiary, in response to a telegram for money, that the balance in the trust fund was "only a little more than $6,000.00", and that at her present rate of expenditures, the fund would soon be exhausted.

The trustee died in 1931, and his sons Hoxie and Charles Anderson were duly appointed executors of his estate, which was administered in the states of California and Oklahoma. During the years 1910 to 1931, the beneficiary never challenged the correctness of the trust account as submitted to her by the trustee from time to time; neither did she file a claim with the estate of the trustee for the amount of the trust, or assert any breach or discrepancy in the administration thereof. But apparently by common consent the executors of the trustee's estate, nephews of the appellant, assumed the obligation of the trusteeship, and on November 18, 1931, Charles Anderson, one of the executors, informed appellant that "the amount my father held in trust on your account on the date of his death" was $4,843.02, including interest; that since that time, she had received from the estate $1,090, leaving "to your credit now $3,827.18". On January 5, 1932, Charles Anderson again wrote to the appellant calling attention to his previous letter, in which he advised her of the balance in the trust account, and "in keeping with the policy followed by my father, would advise that you endeavor to keep your expenses down as much as possible inasmuch as at the rate of $100.00 or so a month, the money you have remaining on our books will soon be entirely spent". On the following June 17th, appellant was informed that the balance of the trust fund amounted to $2,923.02, and that she had received $1,920 since the trustee's death in 1931. On October 28, 1933, the beneficiary was informed that the balance remaining in the trust account was $1,700; that it was earning 5½ per cent interest per annum, and that at the rate of her expenditures, the fund would soon be exhausted. On the following November 22d, the beneficiary wrote to Charles Anderson asking for another $100, and thanked him for the statement of account.

On August 5, 1935, the appellant received an itemized statement of the account from January 1, 1926, to August 1, 1935, which reflected all debits and credits to the trust estate during this period, and the respective dates of each and every item charged or credited. This statement showed a balance in the trust of $93.79, which was paid to the appellant by a check of $75 on September 3, 1935, and a check for $18.79 on the following October 1st. After the rendition of the account and its payment, the appellant made no protest of its correctness, but she continued to importune Charles Anderson for additional money, and he did send her some small checks from time to time, for which he was partially reimbursed out of his father's estate, but as the trial court found, the appellant understood that these payments were wholly gratuitous, and were not made upon any liability arising out of the trust.

C. L. Anderson's estate was finally closed in 1938, and at that time the appellant had not filed any claim with the estate, or asserted any breaches or discrepancies in its administration, either by C. L. Anderson as trustee, or by his sons as executors and successor trustees. Charles Anderson died in 1941, and Hoxie Anderson was appointed as executor of his estate. The first manifestation of dissatisfaction over the administration of the trust estate was the filing of this suit in 1941, ten years after the death of the trustee, and more than five years after the rendition of the final account and its payment by the successor trustees.

The trial court held that the remedy of the appellant against the estate of the trustee was to file a claim against his estate as a creditor, and having failed to do so in the manner provided by law, she was without a remedy for any alleged breach of the trust obligation during the trusteeship of C. L. Anderson. This holding is based upon the factual finding to the effect that from and after December, 1915, the trust estate became commingled with the property of the trustee, and was thereafter identifiable only as a debt upon which he credited the beneficiary with interest; that the trust fund was not traceable to or identifiable in the hands of his administrators, and consequently equity was powerless to impress an equitable lien upon property which it could not identify as trust property, citing Apple v. Hert, 122 Okl. 153, 252 P. 823, 55 A.L.R. 1271.

The parties recognize the general equity rule which authorizes a beneficiary to follow trust property into the hands of the trustee's representatives, and to impress an equitable lien thereon, provided that such property can be traced to the representatives and identified there, either in kind or as a definitely identifiable part of the general mass of the trustee's estate. Cherry v. Territory, 17 Okl. 221, 89 P. 192, 8 L.R.A.,N.S., 1254; Apple v. Hert, supra; Winter v. Klein, 186 Okl. 74, 96 P.2d 83; Eaton v. Husted, Tex.Civ.App., 163 S.W.2d 439; Coombs v. Minor, 60 Cal.App.2d 645, 141 P.2d 491; Restatement of Law on Trusts, Sec. 202, and comments, p. 548. The rule is grounded upon the fundamental principle that trust property is the ward of equitable jurisprudence, and courts of equity will follow and protect trust property by specific remedies as long as it can be identified with reasonable certainty.

Pomeroy's Equity Juris., 4th Ed., Vol. 1, Sec. 170. It is presumed that the trustee intended to and did perform his trust obligation, and "where a trustee has commingled trust funds with his own, the cestui may recover, to the extent of the trust fund, the lowest balance to which the mass has been depleted. The trustee is presumed to have used his own funds first, so that the remainder is sufficiently identified as the trust fund." Ayers v. Fay, 187 Okl. 230, 102 P.2d 156, 159. See also Scott on Trusts, Sections 515, 516, 517 and 521.

Demonstrating the application of this rule, the Oklahoma court in the Apple case held that since the bank account of the trustee into which the trust fund had been commingled was completely exhausted prior to the death of the trustee, and neither the fund nor its substitute was ever traced to or identified in the hands of the administrator of the trustee's estate, the sole remedy of the beneficiary for the wrongful diversion of the trust fund was that of a creditor against the estate; that the cestui was not entitled to impress a trust or enforce an equitable lien upon the estate of the trustee in preference to the other creditors of the estate.

The appellant contends however that the Apple case is not analogous to, or controlling of our facts, but that they fall within the purview of the later case of Ayers v. Fay, supra, which held that the cestui sustained the burden not only of tracing the trust fund into the hands of the trustee, but of satisfactorily establishing that when the bank account was taken over by the administrator, it had never been less than the amount of the trust fund, therefore the fund descended to the trustee's personal representatives; and as between them and the beneficiary, the court would impress a lien upon the assets of the estate so found and identified. Significantly, the Oklahoma court refused to impress a trust upon an automobile in the hands of the administrator, holding that the proof was insufficient to show that it was purchased with any part of the trust funds. The court specifically distinguished the facts in that case from those in the Apple case, with the observation that the bank account of the trustee in the Apple case had been completely exhausted subsequent to the time the beneficiary's funds were deposited therein, and there was no showing that the funds later deposited in the same bank account were any part of the trust funds.

In our case, the trust property became commingled with the assets of the trustee and was not thereafter traceable or identifiable, except as evidenced by bookkeeping entries and the formal acknowledgments of the trustee. But in that manner and to that extent the trust estate was traceable to, and definitely identifiable in the hands of the personal representatives of the trustee's estate, and to that extent subject to the equitable processes of the court. But the funds which are alleged to have been diverted from the trust estate by the wrongful conduct of the trustee and his successors are neither traceable to the representatives of the trust estate, nor identifiable there. There is nothing on this record to show that the trust funds, if diverted, ever came into the hands of the trustee's representatives. Indeed, there is nothing to show that any funds or property of the trustee passed to his representatives, except the sum of $4,843.02, which the representatives formally acknowledged, and with which they charged themselves and undertook to account. It is plain therefore that as to the funds which the appellant alleges were wrongfully diverted by the trustee, she was a creditor of the trustee's estate which was finally closed in 1938 without any claim or complaint having been made by her. See Scott on Trusts, Sec. 202.

By the same rationale, the executors of the estate of C. L. Anderson became the voluntary or constructive trustees of the trust funds (England v. Winslow, 196 Cal. 260, 237 P. 542), the receipt of which was formally acknowledged on November 18, 1931, and those trust funds were traceable and identifiable by bookkeeping entries, banking transactions, formal acknowledgments, and finally by an itemized statement submitted to the beneficiary on August 5, 1935. Furthermore, there is nothing in this record tending to show that any funds alleged to have been diverted by Charles Anderson, as one of the successor trustees, passed into the hands of Hoxie Anderson as executor of his estate. We conclude that the trial court correctly construed and applied the equitable doctrine in accordance with the pronouncements of the Oklahoma court.

But the trial court did not stop there. Based upon evidence in the record, the trial court found that on August 5, 1935, the executors and representatives of C. L. Anderson's estate rendered the beneficiary a purported statement of her trust account disclosing its status, and the balance due her, which was finally paid by check in October, 1935. On this evidence, the trial court held that the rendition of this account was a representation to her that the trust had been fully administered; that she had been paid all sums to which she was entitled, and that this representation was "equivalent to a repudiation of any further liability under the trust, and plaintiff's cause of action if any, accrued on the date when those charged with the administration of the trust made the last payment". And that the appellant not having commenced this action until more than five years after its accrual, is now barred from asserting it.

While statutes of limitation are not strictly applicable to equitable actions, they are helpful as an analogous guide in the application of the equitable rule of laches. Although a beneficiary is not barred merely by lapse of time from enforcing an express trust, if the trustee repudiates the trust to the knowledge of the beneficiary, laches operates to bar the enforcement of a trust obligation when the beneficiary fails to sue the trustee for breach for so long a time, and under such circumstances that it would be inequitable to permit him to hold the trustee liable. See Restatement of Trusts, Sec. 219. "Independently of any statute of limitations, courts of equity uniformly decline to assist a person who has slept upon his rights, and shows no excuse for his laches in asserting them." Speidel v. Henrici, 120 U. S. 377, 7 S.Ct. 610, 612, 30 L.Ed. 718. See also Philippi v. Philippi, 115 U.S. 151, 5 S.Ct. 1181, 29 L.Ed. 336; Gillons v. Shell Co. of California, 10 Cir., 86 F.2d 600; Clark v. City of Chicago, 7 Cir., 70 F.2d 172; Bliss v. Bliss, 65 App.D.C. 147, 81 F. 2d 411.

Making application of this rule, the will which created the trust made no provision for the appointment of a successor trustee, hence the original trust terminated with the death of the original trustee. See Scott on Trusts, Sections 101.1, 104 and 196. And although liability for his wrongful acts may have lived after him, and may have been impressed upon his assets in the hands of his representatives, it clearly became the duty of the beneficiary to exercise reasonable diligence in the pursuance of her equitable remedies after

knowledge of the breaches. Pomeroy's Equity Juris., Vol. 1, 4th Ed., Sec. 419.

 During the lifetime of the trustee, the beneficiary was advised from time to time concerning the status of the estate, the balance therein, and its expectancy. She had actual knowledge of the condition of the estate as represented by the trustees, and there is nothing on this record to show that she was deceived, lulled, or misled by the representations of the ·trustees. Throughout the trustee's lifetime, and for ten years after his death in 1931, she made no complaint of any malfeasance or misfeasance in the administration of the estate. It follows therefore that she is barred by her laches from asserting any claim against C. L. Anderson's estate for any alleged breaches committed during his trusteeship.

Charles and Hoxie Anderson although under no obligation, voluntarily assumed the trusteeship of the balance of the trust estate, and undertook to administer it in the same manner as their father. Accordingly, from time to time between 1931 and 1935, the beneficiary was informed of the status of the trust account; she was warned of its rapid depletion, and was cautioned to be more economical in her withdrawals. In August, 1935, she was informed that in accordance with a submitted itemized statement, there was a balance of $93.79 in the trust account. She made no protest or complaint at that time concerning the administration of the estate by the successor trustees, or the correctness of the account as rendered. Instead she sat by until more than five years after the rendition of the account, amounting to a denial of any further liability, and until the death of one of the trustees, who the record shows had been actively engaged in its administration. In these circumstances, we think laches has cogent application, and that the trial court correctly applied the statute of limitations by analogy.

On the trial of the case, the court was of the opinion that the appellant was an incompetent witness to relate conversations with C. L. Anderson during his lifetime concerning the amount of the trust estate, Title 12, Sec. 384, O.S.A., but allowed her to so testify in order that it might have the benefit of her contentions in· the lawsuit. The trial court also admitted in evidence the books and accounts, supported by the banking transactions of C. L. Anderson, during the period of his trusteeship, which books and records reflected all debits and credits to the trust estate. Although the trial court did not make any findings concerning the accounting, it did hold that there was no competent evidence to establish the existence of a $64,000 trust fund as alleged in the complaint. We have examined for ourselves the entire record in so far as it tends to support the allegations of the complaint, and we are convinced that they are without merit.

The judgment of the trial court is affirmed.